People of the State of Illinois, Plaintiff-Appellee, v. Jackie M. Dockery (Impleaded), Defendant-Appellant.

Gen. No. 50,937.

First District, First Division.

June 13, 1966.

Ralph M. Bernstein and Paul E. Thompson, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Carmen V. Speranza, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

Defendant, Jackie M. Dockery, impleaded, after a jury trial, was found guilty of the crime of voluntary manslaughter and was sentenced to the penitentiary for a term of 4 to 10 years. On appeal, he contends that his constitutional rights were violated, and that he was deprived of a fair trial by the deliberate misconduct of the State's Attorney. This appeal was transferred by the Supreme Court to this court.

The record shows that on June 1, 1964, in response to a telephone call, two police officers found the dead body of William Allenbaugh in a rear yard, lying face

up, with the pants pulled down below the knees and the shirt pulled up under the arms. A coroner's pathologist, who had performed an autopsy on the body, testified as to finding multiple abrasions of the face and chest and the extremities. An internal examination revealed lacerations and contusions of the internal organs and fractures of the ribs from the third to the ninth. In his opinion, the cause of death was a "hemorrhage following multiple internal injuries."

The principal witness for the State was Gary Len Thompson, 16 years of age. At the time of trial, Thompson was under indictment for aiding and concealing a fugitive (defendant Dockery). He testified that he and defendant lived in a room in the Marshall Hotel in Chicago. After visiting his sister on May 31, 1964, Thompson arrived at the hotel room at about 1:00 in the morning on June 1, 1964. Defendant and Allenbaugh were seated on a couch drinking beer and wine as Thompson came in. About 2:30 or 3:00 a. m., Allenbaugh got up to go to the washroom. He fell down two or three times, and Thompson helped him into the washroom, where Allenbaugh fell over a "commode." Allenbaugh stayed in the washroom about 10 or 15 minutes and then got up and fell down again, with his pants below his knees. Defendant returned from purchasing beer, and after going through the pockets of Allenbaugh, carried him back to the couch. Defendant then threw Allenbaugh on the floor and started to beat him. He hit him on the head with a wine bottle first and then dragged Allenbaugh out to a porch, where he kicked Allenbaugh down the stairs to the second floor.

Thompson also testified, "Between the time he struck him with the wine bottle and the time he dragged him to the porch he was bleeding. He was bleeding from the head I think. Mr. Allenbaugh was lying on the couch when Jackie Dockery threw him on the floor and started to beat him. After he was on the floor, and Jackie

348

Dockery started to hit him, he just lay there. He did not strike or provoke Jackie to strike him first. He did not strike Jackie. . . . On the back porch Mr. Allenbaugh started to get up and walk down the steps, then, Jackie kicked him and he fell down. He put his foot on his back and kicked and shoved him. Allenbaugh went down to the first floor. He fell down with his back stooping. Jackie Dockery or myself struck Allenbaugh on that occasion, I hit him twice before the fight. During the fight, I didn't hit him, not once. I don't know how many times Jackie Dockery struck him. . . . He struck him on the chest . . . and the side. He struck him with his feet. He did not strike him with anything other than his feet and the wine bottle. After he went down the stairs, Allenbaugh was on the first floor. Then me and Jackie went down about 30 minutes later. He was still there. So we carried him out the back. Jackie got his waist, I got one of his feet. We put him out around to the side of the building."

Thompson identified a picture of Allenbaugh's body and said, "That is how he was dressed when Jackie was striking and kicking him, with his pants down around below his knees."

Thompson further testified that he and defendant went back upstairs about 2:30 a. m. and went to bed. They arose about 8:30 and looked into the back yard and saw two or three police officers, and Allenbaugh's body was still there. Thompson and defendant dressed and went to work, and neither stopped to talk to the police officers about what happened the night before. Thompson identified a shirt as the one with which he "wiped up the blood from where he hit him on the head with the wine bottle, in the living room. Jackie used the white shirt to wipe up the blood. I wiped off some on the couch."

Thompson also testified on cross-examination that a statement he gave at the coroner's inquest that decedent "came after Jackie with a blackjack" was untrue and

349

that Jackie had told him to say it. He admitted that he never saw a blackjack in the apartment. On redirect examination, Thompson admitted he again lied when he testified previously that he did not talk with the Assistant State's Attorneys before taking the witness stand.

Two police officers testified as to finding the body and its condition. They also described the hotel room and found blood stains on a blue shirt and a white shirt, which were introduced into evidence.

The State introduced into evidence as Exhibit 10, and read to the jury over the objections of defendant, a transcript of an oral statement made by defendant on June 4, 1964, after his arrest. A motion to suppress this statement had been made and denied before trial. At that time it was stipulated that at the time the statement was taken by the police, defendant was not advised that he had a right to counsel nor did defendant ask for counsel.

The defense witnesses included defendant's brother, Harold Dockery, who testified that on the afternoon of June 1, defendant told him he had a fight and was fired from his job. Harold called a friend of his, Eugene Hartman, who engaged defendant for construction work. Hartman testified that his business was swimming pool excavations, and he hired defendant on June 1 for an indefinite period. They commenced work the next morning at Frankfort, Illinois, digging a swimming pool. On June 2, they went to Frankfort and then to Kankakee, Illinois, where defendant was arrested.

Defendant testified that on the evening of May 31, 1964, at about eight or nine o'clock, while walking toward his home, he was introduced to decedent by two friends, and he visited with them on the street for a short time. He then returned to his apartment and later, as he left to go to his girl friend's house, he saw the decedent sitting on the steps of the building in which he lived. The decedent asked him for his apartment number, and he

told him. Decedent had a work shirt, a green pair of trousers, a long beard, and was dirty. After visiting his girl friend, defendant returned and found decedent in his apartment, lying on the couch asleep. They commenced drinking, and defendant gave money to decedent to get a bottle of wine. Decedent drank wine, and defendant drank beer.

Thompson came in about two o'clock, and decedent wanted to know who Thompson was and what he was doing there. After an argument between Thompson and the decedent, defendant asked decedent to leave. "Then I asked Allenbaugh to leave again and he got up and swore at me and I got up and Mr. Allenbaugh swung at me and when he swung at me, I caught his lick and knocked him down. He had something in his hand and it looked like a blackjack. . . . After he swung at me I caught Allenbaugh's leg and knocked him down and we commenced fighting and Mr. Allenbaugh was on the floor striking, striking back at me, and I was striking at Mr. Allenbaugh to keep him from getting back up to me. I kicked him because it was to keep him from getting on me. Gary Thompson struck William Allenbaugh also. He struck him two or three times. . . . I never hit Mr. Allenbaugh with a bottle. There was broken glass around, a broken bottle, but I don't know how the bottle got broke."

After some time, Allenbaugh went to the washroom, and defendant heard something hit the floor, and he and Thompson found Allenbaugh lying on the kitchen floor. "His pants were down about his knees and his shirt was unbuttoned. . . . Mr. Allenbaugh was bleeding about his head. . . . The next thing that happened was that me and Gary took Mr. Allenbaugh up and took him to the couch. I told Gary, let's get our coats and go for a walk. We walked to the corner of Clifton and Wilson and when we came back, Mr. Allenbaugh was gone. . . . I never pushed Mr. Allenbaugh down those stairs. I did not put

351

my foot into his chest and push him down the stairs. I did not drag Mr. Allenbaugh with Gary to the bottom of the stairs. I did not touch Mr. Allenbaugh at the bottom of the stairs."

Defendant further testified that the next morning, Thompson awakened him and said there was a man lying in the back yard. He looked out of the window and saw that it was Allenbaugh, but did not go down because there was a police officer there. There was blood around the house, and he wiped it up with shirts. He went to the home of his brother, and Harold got him a job, and he went to work. He was working in Kankakee when the police arrested him and returned him to Chicago. "I did not flee at any time away from Chicago. . . . I didn't kill Mr. Allenbaugh."

On cross-examination, he was questioned about two statements (People's Exhibits 10 and 11) taken by the police after he was returned to Chicago. Each exhibit bore his signature, and the pages were initialed. He admitted that neither statement mentioned decedent having a blackjack. He was further interrogated about specific questions and answers contained in the statements.

During cross-examination and after defendant stated that he had read and signed the statements for the police, he was asked, "Did you at that time tell Officer Nickels that this statement wasn't in fact true?" Defendant objected to this line of questioning on the ground that defendant was not served with notice of any oral statement given to Officer Nickels. The State asserted that it was impeachment, and the court ruled the question proper. Defendant then answered, "I don't remember."

Defendant was also asked, "Isn't it a fact that you told Officer Nickels at that time that you in fact had stomped Mr. Allenbaugh," and defendant answered, "I told Mr. Nickels I had a fight with Mr. Allenbaugh."

352

On defendant's objection to the question and answer, the court directed that the answer be stricken. Defendant then moved for a mistrial because defendant had not been served with notice of any oral statement made to Officer Nickels, and the motion was denied. Over objection to the question, defendant also denied telling Officer Nickels that he had knocked the body of the decedent "down the stairs and dragged him through the yard."

Another witness for defendant, a medical expert in pathology, testified that he had read the pathological report concerning the death of the decedent. The witness said that in his opinion it was impossible to tell whether or not there was any brain damage in a body "without doing an internal examination of the skull and brain." He was examined at length as to brain damage due to trauma and hemorrhage within the brain, which the court permitted because there was some evidence that decedent struck his head, and the witness was permitted to state, when being questioned about an external examination of the skull, that a person with brain injuries "may or may not have external injuries seen on external examination of the head and it is quite common for there to be very little external injury or even no external injury to the surface of the head and still have serious internal injuries to the brain." The pathologist further stated that he felt the autopsy was incomplete, in that the examination did not include "the internal contents of the head, that is, the skull and brain." The court sustained an objection to a question concerning possible brain damage to a man who "walked into a bathroom, fell and hit his head on a kitchen table." On cross-examination, he stated that a ruptured spleen is, by itself, a cause of death.

In rebuttal and on behalf of the State, Police Officer Edward Nickels testified that People's Exhibit 10 was read by him to defendant, and at the conclusion of read-

ing Nickels had a conversation with defendant. On defendant's objection, a hearing was had in the chambers and out of the presence of the jury. Defendant then objected to any oral conversation that may have taken place between defendant and Police Officer Nickels for the reason that they were not given any notice of oral conversation "that might constitute admission or confession that the defendant had with Officer Nickels."

The State replied in substance, "The defendant saw fit to take the stand and take the oath and testify to certain facts and you can always show a prior inconsistent statement of any witness." The court stated, "You can't come through by the back door when you cannot get through the front door with it, if you haven't had the opportunity. I am going to rule you can't do it." The objection was partially sustained, and Officer Nickels was permitted to testify that defendant made an oral statement to Nickels "that he did carry the body down the stairs and placed it in the yard," and that at no time did defendant mention anything about a blackjack.

We consider first defendant's contention that his constitutional rights were abridged by the use at the trial of his two oral statements, reduced to writing, Exhibits 10 and 11. Defendant argues these statements were made after he was taken into custody, pursuant to a warrant which charged him with murder, and "in this respect, the investigation had ceased being a search for a suspect and had become an accusatory process. In a sense, it was similar to a direct indictment in that witnesses had been called before a formal judicial entity to accuse a certain suspect and begin the movement to trial." Authorities cited in support include Spano v. New York, 360 US 315 (1959); Escobedo v. Illinois, 378 US 478 (1964); and Powell v. Alabama, 287 US 45 (1932).

In Spano, the defendant had been indicted and surrendered himself to the police in the company of his

attorney. His attorney left after cautioning Spano not to talk to the police. After persistent questioning by the police, a confession was obtained from Spano. In that case the Supreme Court said (p 320):

> "Petitioner's first contention is that his absolute right to counsel in a capital case . . . became operative on the return of an indictment against him, for at that time he was in every sense a defendant in a criminal case, the grand jury having found sufficient cause to believe that he had committed the crime. . . . We find it unnecessary to reach that conclusion, for we find use of the confession obtained here inconsistent with the Fourteenth Amendment under traditional principles."

In a concurring opinion, Justice Douglas said:

> "Depriving a person, formally charged with a crime of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself."

The State contends, however, that there is no confession involved, and "nowhere does the defendant claim that he killed the deceased." ■ We are not persuaded that we are required to equate a defendant's status immediately after an arrest pursuant to a warrant with a defendant's status after he has been formally charged with a crime. The issuance of an arrest warrant does not, of itself, formally charge a defendant with crime. (See Douglas, J., concurring, in Spano v. New York.) Moreover, there is no language found in Massiah v. United States, 377 US 201 (1964), which dictates a conclusion that a defendant has an absolute right to a lawyer at any time before indictment. Therefore, the controlling principles to be applied here must be found in Escobedo v. Illinois, 378 US 478, as interpreted in People v. Hartgraves, 31 Ill

2d 375, 202 NE2d 33 (1964) and People v. Kees, 32 Ill2d 299, 205 NE2d 729 (1965).

██ ██ If the written statements made by defendant to the police after his arrest could be validly contended to be in the nature of a confession, we consider the pronouncements made in People v. Kees to be controlling here:

> "This court, however, in People v. Hartgraves . . . has aligned itself with those courts which have construed Escobedo to be limited to the peculiar facts of the case, and have rejected it as promulgating the sweeping rule that a confession may not be received if made by an accused without counsel, or unless the right to counsel has been intelligently waived."

Examining the circumstances of the making of defendant's written statements, we find no evidence of coercion or any promise of leniency, and none is charged. State's Exhibit 10, which was read to the jury, shows that before it was taken, defendant was admonished that "you are free to give a statement; whether you give a statement or not depending on what you wish, and that anything you do say can be used against you or for you as evidence in Court." This statement of defendant (Exhibit 10) is substantially the same as defendant's direct and exculpatory testimony given in his own behalf. Moreover, it was stipulated at trial that defendant made no request for counsel. Therefore, we find no error in receiving into evidence defendant's written statement identified as State's Exhibit 10. People v. Hartgraves, 31 Ill2d 375, 202 NE2d 33 (1964).

Defendant's next contention is "the deliberate misconduct of the State's Attorney deprived the defendant of a fair trial," particularly in the cross-examination of defendant regarding his conversation with Officer Nickels

following the signing of the written statement and the rebuttal testimony of Officer Nickels. Defendant relies principally on People v. Pelkola, 19 Ill2d 156, 166 NE2d 54 (1960), where our Supreme Court said (p 161):

> "While it has been held on numerous occasions that it is always competent to show, as a matter of impeachment, that a witness, even if he be the accused, made a statement outside of court concerning material matters which was inconsistent with his testimony on the witness stand . . . , we agree with defendant, under the circumstances of this case, that evidence of the oral confession made to detective Krause was inadmissible for any purpose. This is not a case where the trial court, in the exercise of its discretionary powers, admitted evidence in rebuttal which could and properly should have been introduced in chief, . . . but one in which . . . evidence of an oral confession was inadmissible as evidence of guilt. This being the case, it is our opinion, again by force of the statute, that the evidence was likewise inadmissible for purposes of impeachment.
>
> "When called upon to deal with use of confessions for impeachment purposes, we have held that fundamental justice will not countenance accomplishment, by indirection, of that which it will not permit directly, and have held that confessions otherwise incompetent do not become competent when offered to impeach either a witness or an accused. . . . In short, it is our opinion that the statute leaves no area of discretion to a trial court and that the legislature intended compliance with the notice provisions before an oral confession could be admitted in evidence for any purpose. Accordingly, it is our opinion that the evidence of the oral confession made to Krause was improperly received in this case.

"We are of the further opinion, however, that the error of the trial court does not justify a reversal of the judgment of conviction. Error in the admission of evidence is harmless where the facts involved are established . . . , particularly where such other evidence is on the issue of the guilt of the accused. . . . Again, we have said that whether the admission of incompetent evidence is sufficient ground to require reversal depends on the facts in each case, . . . and have held that where the record contains sufficient competent evidence to establish the guilt of a defendant beyond reasonable doubt, the judgment will not be reversed for error in admitting evidence unless it can be seen that the error was prejudicial."

Defendant also argues that "the testimony of Thompson, who admittedly perjured himself on every occasion when he testified and testified in his own words that he 'never told the same story to anybody more than once,' certainly creates a close question of fact wherein the defendant's highly incriminating statement was very important."

The State answers that the question area of cross-examination and the rebuttal testimony of Officer Nickels concerned only "mere admissions" and not an oral confession. Therefore, any requirements of notice to defendant of "an oral confession" are not in point.

■ ■ We thoroughly agree, as said in People v. Pelkola, "that fundamental justice will not countenance accomplishment, by indirection, of that which it will not permit directly," and that "the legislature intended compliance with the notice provisions before an oral confession could be admitted in evidence for any purpose."

■ However, the questioning of defendant on cross-examination, of which complaint is made, does not come within the area of an oral confession. Even if he

358

had told Officer Nickels that he had "stomped" Mr. Allenbaugh, it cannot reasonably be considered to be a confession or acknowledgment of guilt here because he testified on direct examination that he had a fight with decedent which included some kicking. The implied admission of defendant to Officer Nickels that his written statement "was not true" was not a confession or evidence of guilt, and its receipt as evidence was within the trial court's discretion. As stated in People v. Stanton, 16 Ill2d 459, 466, 158 NE2d 47 (1959):

> "There is a distinction between a statement which is only an admission and one which constitutes a confession of guilt of the crime charged. A confession is a voluntary acknowledgment of guilt after the perpetration of an offense, and it does not embrace mere statements or declarations of independent facts from which guilt may be inferred, while an admission is any statement or conduct from which guilt of the crime may be inferred but from which guilt does not necessarily follow."

We find no error here. See, also, People v. Speice, 23 Ill2d 40, 46, 177 NE2d 233 (1961).

■ Neither do we find error in the receipt of the rebuttal testimony of Officer Nickels that defendant stated he did carry the body down the stairs and place it in the yard, and that nothing was said by defendant about a blackjack. These questions were proper here as rebuttal for the purpose of impeachment.

■ Defendant next contends that the direct examination of the defendant's medical expert was improperly restricted. The autopsy performed on the body of the deceased did not include an internal examination of the skull, hence there were no findings as to brain damage or whether the deceased had a "subdural hematoma." The pathologist for the State testified that such an internal examination was unnecessary, as he determined

359

the cause of death to be hemorrhage following multiple internal injuries.

Thereafter, the court allowed defendant's doctor to testify with great latitude regarding the definition and cause of "subdural hematoma" and "arterio-sclerosis of the vessels of the brain," and the possibility of death due to brain injury with "very little external injury or even no external injury to the surface of the head and still have serious internal injuries to the brain." We conclude the issue as to the cause of the death of the decedent was properly presented to the jury for its determination. We find no error here.

 Finally, defendant contends the court erred in refusing the defendant's instruction on involuntary manslaughter. Authorities cited include People v. McCrory, 25 Ill2d 213, 184 NE2d 846 (1962), where defendant's basic contention was that he was guilty of murder or else the killing was in justifiable self-defense. On this point defendant argues there was substantial evidence of excessive drinking and no evidence of the use of deadly weapons, and "the fact that the basic defense of the defendant was one of self-defense does not deprive him of any verdict form that may be indicated by evidence in either the State's case or the case of the defense."

The State argues that the defense was that the decedent died as a result of an accident, and "although the defendant does mention that he struck the deceased in self-defense, his whole defense is keyed to the deceased causing his own death when he fell and struck his head by the kitchen table." We agree with the State that neither the defense of self-defense nor of accident caused by the decedent are consistent with death by involuntary manslaughter. As said in Davis v. People, 114 Ill 86, 97, 29 NE 192 (1885):

> "The case made by the evidence was either murder or voluntary manslaughter. It contained not a

single element, other than the killing itself, of involuntary manslaughter, and had the court specifically defined involuntary manslaughter, it would have answered no good purpose. It would have directed the attention of the jury to a principle of law not applicable to the facts of the case, and the result would have been to confuse rather than to enlighten them on the issue they were to try."

 In this case, the testimony of Gary Thompson and the defendant varied considerably in the key areas as to the extent of defendant's physical attacks on the decedent, whether the decedent had a blackjack, and as to the disposal of the body. Thompson admitted from the witness stand that he had lied about decedent's having a blackjack and whether he had talked to the Assistant State's Attorney prior to the trial. There was sufficient evidence presented to the jury to establish defendant's guilt, beyond a reasonable doubt, of the crime of voluntary manslaughter, and as the choice of which witness was telling the truth rested with the jury, we see no basis for substituting our judgment in such respect.

Defendant received a fair trial and, as we find no prejudicial error in this record, the judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.