THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY F. DILLON *et al.*, Defendants-Appellants.

(No. 56212; ▮▮▮▮▮▮▮▮▮▮▮▮

First District (2nd Division)—April 15, 1975.

James J. Doherty, Public Defender, of Chicago (Shelvin Singer, Assistant Public Defender, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Thomas A. Mauet, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HAYES delivered the opinion of the court:

Defendants Jerry F. Dillon and Robert James were indicted with Louella Kentris and Daniel Williams for the murder of Vernon Davis. (Ill. Rev. Stat. 1971, ch. 38, par. 9—1.) After Kentris and Williams were granted severances, Dillon and James, in a bench trial, were found guilty of the lesser included offense of voluntary manslaughter and each was sentenced to the penitentiary for a term of 1 to 20 years. Ill. Rev. Stat. 1971, ch. 38, par. 9—2.

Defendants present the following issues for review: (1) whether there was any causal connection between their acts and Davis' death; (2) whether they were proven guilty beyond a reasonable doubt; and (3) whether the evidence presented allowed a finding of the lesser included offense of voluntary manslaughter.

Owing to the conflicting and confusing testimony presented at trial, it is difficult to determine exactly what happened in this incident. However, some facts are not in dispute. It appears a party was in progress on 2 May 1970 in the second floor apartment of Louella Kentris. Among those she was entertaining were the decedent (Vernon Davis), defendants, and Daniel Williams. It is evident that there was heavy drinking engaged in by all and that the party continued all day, that night, and into the next day. At some time between 11 P.M. and midnight on 2 May 1970, an altercation occurred between defendants and the deceased. As a result of the altercation, Davis received severe blows to the head, was rendered unconscious, and was then placed on a couch. At some time after 2 A.M. on 3 May 1970, Davis either left the apartment by himself, or his unconscious body was removed by Dillon and Kentris. At 4:20 P.M. on 4 May 1970, the dead body of Vernon Davis was discovered in a ground floor hallway below the apartment of Louella Kentris. According to the coroner, Davis could have been dead anywhere from 12 to 24 hours. Aside from those meager facts, the testimony adduced at trial was confused and inconsistent.

James Ashmon, a witness for the State, testified that when he arrived at Louella Kentris' apartment at approximately 9 P.M. on 2 May 1970, everyone present was drinking. Around 11 P.M. while he was in the washroom, he heard strange noises coming from the living room. When he came out, he observed Dillon and James standing over Davis and hitting him with their fists. He saw Dillon and James strike Davis three or four times before he interceded to stop the fight and then helped place Davis on a couch. He testified that, although blood was coming from Davis' mouth, and although he looked "pretty bad," he did not look as bad as he did when he was found almost 2 days later. Ashmon

also testified that on the day following the altercation, he met James who stated: "I think we killed him."

On cross-examination, Ashmon admitted that Williams was also standing over Davis when Ashmon came out of the washroom, but he testified that he did not see Williams strike Davis. He had been a friend of Williams for 10 years. However, upon further questioning, Ashmon admitted that on three prior occasions he had stated that Williams did strike Davis that evening: in a statement which Ashmon had given to the police, in testifying before the grand jury, and in recounting a confrontation between Williams and himself on the day following the incident. Although he admitted making all three statements, he claimed he had been mistaken at the time he made them. The witness also testified that earlier on the day of May 2, he observed Williams threaten Davis with a knife. However, Ashmon could offer no explanation for that incident other than that Williams becomes "mean" when drinking.

Daniel Williams, a severed co-indictee, testified for the State. He arrived at Louella Kentris' apartment at 8:40 P.M. on May 2, 1970, and saw Ashmon arrive around 10:30 P.M. At approximately 11 P.M. an argument erupted between Davis and James. James struck Davis with his fists on the right temple approximately four or five times. At this point, Dillon also joined in the attack on Davis hitting Davis with his fists. As Dillon continued to strike Davis on his face with his fists for 2 or 3 minutes, James struck Davis on the head with a metal stove pipe approximately 3 to 4 inches in diameter. During the fight, Davis never struck anyone with his fists nor did he draw a knife. Dillon and James then moved Davis, bleeding from the head, mouth and eyes, to the couch. At this point, Davis was breathing very heavily and making rasping sounds. At sometime between 11:20 and 11:30 P.M., two Chicago police officers arrived to investigate a disturbance. During the minute or two that the officers were in the apartment, they walked over to Davis, still on the couch, shined a flashlight on his face, and inquired as to his condition. They were told it was caused by a fight and too much to drink. The officers suggested that Davis be taken to the hospital and left. Thereafter, Dillon warned all those present not to get upset or say anything about what had happened. Sometime after the police left but before midnight, Dillon and Louella Kentris dragged Davis' still-living body from the apartment and placed it downstairs.[1] Later, at approximately 11:50 P.M., Dillon, James, Kentris, and Williams left to purchase

---

[1] The record is unclear whether Dillon and Kentris placed Davis in the ground floor hallway where he was eventually found or in some other ground floor area of the building. However, it seems clear that Davis was taken "downstairs."

some liquor. Although he did not actually see Davis' body when he left for the liquor store, Williams stated that it was still there in the hallway.[2] Finally, Williams testified that Davis was in the same condition when he was taken from the apartment as he was when his dead body was discovered almost 2 days later.

On cross-examination, Williams stated that he never struck Davis, and that he had not threatened Davis with a knife earlier on May 2, 1970. However, Williams admitted that after the fight, Ashmon was spreading the rumor that he had killed Davis and that these accusations resulted in a fight between Williams and Ashmon in which Ashmon broke Williams' jaw. Williams also stated that, when Davis' body was taken from the apartment, Davis had on his pants and shirt. The witness also stated that, although Davis did have a knife on him that night, he never used it during the fight. Finally, Williams admitted that the State had agreed to drop all charges against him in exchange for his testimony against Dillon and James.

Leo Kerkstra, a Chicago police officer, testified for the State. At 4:20 P.M. on May 4, 1970, he was directed to the ground floor hallway of Louella Kentris' apartment where he found Vernon Davis' body. Davis' trousers were down close to his ankles and the top clothing was pulled upwards. Although the hallway was poorly lit, there was sufficient light to see what he was doing. Other than on the deceased, there was no blood in the hallway.

Dr. Jerry Kearns, a pathologist for Cook County, also testified for the State. He testified that the deceased suffered extensive brain lacerations which were caused by external violence applied to the head, lower lip, forehead, and brain. The cause of death was violence to the head, traumatic cerebral lacerations. In his opinion, this condition was brought about by blows with fists since his examination revealed no abrasive marks commonly left by clubs or knives and specifically no marks indicative of a blow with a metal pipe. Dr. Kearns testified that, although the injuries were fatal, they would not cause instant death. Although the deceased could have lingered for 24 to 36 hours before death, the doctor doubted that he would have been able to regain consciousness. Finally, he testified that the deceased had been dead for anywhere from 12 to 24 hours.

On cross-examination, the doctor stated that there was a swelling under the back of the deceased's hands and that this type of trauma

---

[2] Although there is no indication as to what observations Williams relied on, he testified that Davis' body could not possibly have been gone when he left for the liquor store.

usually results from a blow with a clinched fist. This swelling was found under both the deceased's hands.

Viola Rizer, mother of Louella Kentris, testified for the defense. She arrived at her daughter's apartment at approximately 1:30 A.M. on May 3, 1970. While there, she saw Vernon Davis lying on the couch. Although she did not notice it at first, a small amount of blood was "trickling" from Davis' mouth. He was breathing loudly but not unusually. When Mrs. Rizer left the apartment at 1:55 A.M., Davis was still alive. On the way out, she noticed four or five strange men standing at the gate at the rear of the building.

On cross-examination, Mrs. Rizer testified that she observed Dillon pick Davis off the couch and place him on the floor. At that time, Dillon stated that he was going to put Davis in the alley where he belonged because, if it had not been for him, the police would not have been there.

Thomas Ferry, a Chicago police officer, testified for the defense. He was assigned to investigate the death of Vernon Davis. He found no money, identification, or knife on the deceased. Daniel Williams gave an oral statement to him in which Williams stated that he helped carry the body of Davis down to where it was found.

Defendant James testified on his own behalf. He arrived at Louella Kentris' apartment about 8:30 A.M. on May 2, 1970. At approximately 9:30 A.M. Vernon Davis arrived; at 11:00 A.M., Dillon arrived; and at 1:00 P.M., Daniel Williams arrived. The witness did not recall ever seeing James Ashmon in the apartment on May 2, 1970. The drinking started at approximately 10 A.M. and continued into the next day. Trips were made to the store to purchase additional liquor seven or eight times that day. Although Vernon Davis contributed to these purchases, he never saw Davis with a wallet. At approximately 11 P.M., he was in the bedroom when he heard Dillon yell: "He has a knife." He walked into the living room and observed Vernon Davis threatening Dillon with a knife. Although Dillon's hand was cut, the witness observed Dillon hit Davis once, staggering him, but not sending him to the floor. At this point, Davis, with the knife, turned on the witness. The witness struck Davis and grabbed his arm, causing Davis to fall to the floor and drop the knife. A fist fight then ensued, James striking Davis three times, possibly in the mouth, and Davis striking James twice. After approximately three minutes, Louella Kentris interceded to stop the fight. Three or four minutes later, Williams jumped on Davis, pushing him to the couch and beating him for three or four minutes, striking him three or four times in the face. Although Davis attempted to defend himself and struck back with his fists, Williams had to be pulled off Davis by those present. They then placed Davis on the couch. Between midnight and

1 A.M. two policemen came to the apartment to investigate a disturbance. Dillon had then gone to the store and Davis was "asleep" on the couch. The policemen did not examine Davis but merely walked over to the couch and looked down at him. The witness testified that Davis was not bleeding. After a few minutes the police left. Five minutes after the police departed, Mrs. Rizer, Louella Kentris' mother, arrived at the apartment. During the few minutes that she remained in the apartment, Dillon did not come back from the store. When James escorted Mrs. Rizer to a cab stand, he saw four or five strange men standing at the gate at the rear of the building. Upon his return at 2 A.M., Dillon had returned to the apartment and Davis was gone. When he last saw Davis, Davis' condition was not as bad as it was when his body was found. James stated that, earlier in the day, Williams had pulled a knife on Davis for some unknown reason, causing Davis to flee in fear. The witness further testified that he and Davis were "joking" most of the day about what the witness was doing at the Kentris apartment when Davis was supposed to be Kentris' "boyfriend."

On cross-examination, James stated that he was "staying" in the Kentris apartment, but he was not "living" with Louella Kentris. Also, on cross-examination, James' version of the fight was somewhat different. In this version, Davis had to be placed on the couch immediately after he and Davis were finished fighting. In this version, Williams attacked Davis while Davis was already lying on the couch with his eyes closed.

Defendant Dillon testified on his own behalf. When he arrived at the Kentris apartment at approximately 1 P.M. on May 2, 1970, Louella Kentris, Vernon Davis, and James were present. He left to purchase liquor several times and on one occasion noticed that Davis took his contribution to the purchase price from something resembling a wallet. According to Dillon, Davis left at 10:30 or 11 P.M., returning again at midnight. Upon his return, Davis pulled a knife on Dillon, cutting him on the hand. Dillon stated that Davis acted as if he were "crazy or something." Dillon struck Davis in the chest, at which time James emerged from the bedroom. At this point, Davis went after James with the knife, but James struck first, causing the knife to fall from Davis' hand. A scuffle, lasting three or four minutes, ensued between the two, each exchanging three or four blows. The first was stopped upon the intervention of Louella Kentris. According to the witness, it was then that Williams jumped on Davis and beat him on the face and the side of the head for 3 or 4 minutes. Davis did not fight back; James and Kentris had to pull Williams off of Davis, and place Davis on the couch. Sometime after the fight, the witness left to buy more liquor. The police were on their way in as he was on his way out, and were still there upon his

return. They looked at Davis as he lay on the couch and, although Davis was bleeding, the police said nothing and left. After the police left, Viola Rizer arrived and stayed for 5 minutes. When she left, James ac-accompanied her. The witness fell asleep and when he awoke the next morning, Davis was not there. He did not know where he had gone.

On cross-examination, the witness now stated that Davis was not bleeding when Mrs. Rizer was in the apartment. He stated that he did not tell the police of Davis' knife assault upon him because he did not think anything of it. Finally, he never saw Ashmon in the apartment that day.

Defendants first contend that the State failed to prove a causal connection between the altercation and the ensuing death of Davis. Specifically, it is argued that the few blows struck by defendants could not have caused Davis' death. Moreover, defendants suggest that the considerable interval between the time Davis was placed in the ground floor hallway and the time his body was discovered raises the inference of intervention by some unknown third party.

■■ The determination of whether there was a causal relationship between the defendants' conduct and the decedent's death is a matter properly left to the trier of fact. (*People v. Ellison* (1970), 121 Ill.App.2d 149, 257 N.E.2d 199.) A judge, sitting without a jury, may weigh the evidence and is not required to disregard the natural inferences that flow from the evidence heard. *People v. Burton* (1972), 6 Ill.App.3d 879, 286 N.E.2d 792.

■■ In the instant case there was testimony that Davis died from traumatic cerebral lacerations caused by blows with a fist. There was further testimony that, although these injuries would not cause instant death, they were fatal and that it was unlikely that Davis would have been able to regain consciousness. Defendants admit that their altercation with Davis lasted three or four minutes. And on cross-examination Dillon stated that Davis was placed on the couch, apparently unconscious, immediately after defendants had struck him. Although both defendants testified that Williams also joined in the attack on Davis, this fact alone would not necessarily exculpate defendants. For it is clear that the injuries inflicted by defendants need not be the sole and immediate cause of death. (*People v. Reader* (1962), 26 Ill.2d 210, 186 N.E.2d 298.) Moreover, the trial judge had the testimony of Ashmon and Williams before him. In their version of the incident, defendants alone attacked Davis, and with such severity that he was rendered unconscious with blood coming from his head, mouth, and eyes. According to Ashmon and Williams, Davis, having difficulty breathing, was then placed on the couch and was never again observed moving under his own volition.

Finally, Williams testified that Davis was later moved by Dillon and Louella Kentris to the same place where he was subsequently found dead. At the time he was moved, his condition appeared as bad as when he was discovered.

It is the function of the trier of fact to weigh the testimony, judge credibility of witnesses, and determine factual matters in debatable sets of circumstances. (*People v. Nicholls* (1969), 42 Ill.2d 91, 245 N.E.2d 771.) Here the trial court could accept the testimony of Ashmon and Williams and on that basis properly conclude that the blows struck by defendants rendered Davis unconscious and ultimately resulted in his death. The defendants' own testimony does not in any substantial manner negate such a conclusion, but in many respects supports such a conclusion.

Defendants' mere assertion that it is unlikely that four or five blows would result in Davis' death is not in any way supported by the evidence, expert or otherwise. In fact, defendants' argument runs contra to Davis' admitted prolonged unconsciousness after the fight, to the similarity in his appearance at the end of the fight and when his body was discovered, to the fact that his body was found where it had been placed, and to his ultimate death. See *People v. Mighell* (1912), 254 Ill. 53, 98 N.E. 236.

Defendants' argument that the substantial interval of time between the fight and Davis' death raises a reasonable doubt as to the cause of death is likewise not supported by the record. The pathologist testified that Davis could have lingered with his injuries for 24 to 36 hours and that when discovered, Davis could have been dead anywhere from 12 to 24 hours. Since the fight occurred at 11 P.M. on May 2 and the body was discovered at 4:30 P.M. on May 4, there was thus substantial medical testimony to support a finding that defendants' blows resulted in Davis' death. Defendants' suggestion that Davis was actually killed by the four or five "strangers" observed in the area that night is unpersuasive. For although Davis had bled substantially from his eyes and mouth prior to death, there was no blood found in the ground floor hallway. It is unlikely that Davis could have been attacked in the hallway so severely as to cause such a loss of blood and yet not leave any blood in the area of the hallway. Rather, such a lack of blood in the hallway suggests that Davis was beaten somewhere else and then taken to the hallway, exactly as alleged by the State. Such a conclusion is additionally supported by the testimony as to Davis' condition at the end of the altercation while still in the apartment.

■■ While defendants' theories as to what might have occurred between the fight and discovery of the body are imaginative, they are not

supported by the record. Consequently, defendants' reliance on *People v. Ibom* (1962), 25 Ill.2d 585, 185 N.E.2d 690, is misplaced. For while *Ibom* indicates that where a hypothesis consistent with innocence exists, the accused must be acquitted, *Ibom* also requires that that hypothesis be somehow supported by the evidence. In the instant case, defendants rely on nothing more than conjecture and speculation. The mere fact that there was an interval between the fight and death does not preclude a finding that the fight caused that death. (See *People v. Riley* (1964), 31 Ill.2d 490, 202 N.E.2d 531.) Rather, the law is that when the State has shown the existence, through the act of defendants, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendants. (*People v. Meyers* (1946), 392 Ill. 355, 64 N.E.2d 531.) Here the State has made a sufficient showing that Davis' death resulted from defendants' blows. Defendants have failed to point to any ·evidence which indicates otherwise. On the basis of the entire record, the trial court could have properly found that there was a causal connection between Davis' death and defendants' conduct.

Defendants next contend that the testimony of Ashmon and Williams was materially inconsistent and substantially impeached, and consequently, they were not proven guilty beyond a reasonable doubt. Defendants contend that their testimony as to self-defense should have been believed by the trial court. In this regard, defendants especially attack the testimony of Williams since he cooperated with the prosecution only after the State agreed to dismiss the murder charge against him. Defendants also argue that the State's failure to call certain witnesses must indicate that their testimony would be unfavorable to the State.

Defendants point to several instances where the testimony of Ashmon and Williams was conflicting or impeached: Ashmon stated to the police that Williams had participated in the killing, but at trial asserted that Williams had not participated; Ashmon testified that earlier on the day of the killing Williams had threatened Davis with a knife, while Williams denied this ever occurred; Ashmon and Williams differed about the time when Ashmon was in the apartment; both Ashmon and Williams in their testimony to the police, to the grand jury, and at trial differed as to the role Williams played in the killing; and Williams' testimony as to who moved Davis from the apartment and as to where Davis was taken was confusing, and conflicted with earlier statements given to the police.

■■ It would serve no useful purpose to again summarize all the testimony. However, the mere fact that there are inconsistencies or conflicts in the testimony does not, by itself, raise a·reasonable doubt as to defendants' guilt. For the courts have repeatedly held that matters of conflicts

in testimony and questions of credibility of witnesses are for determination by the trier of fact, and, unless the evidence presented is so improbable, unbelievable or unsatisfactory as to raise a serious question as to the guilt of defendants, such a determination by the trier of fact will not be disturbed on appeal. (*People v. Bonds* (1969), 108 Ill.App.2d 97, 247 N.E.2d 46.) In such a case, the reviewing court should not focus on isolated instances of testimony but must instead examine the evidence as a whole.

■■ In the instant case, the testimony of Ashmon and Williams was consistent on the central issue of defendants' involvement. Both saw Davis being beaten by defendants and then, while unconscious and bleeding from the head, placed on the couch. Williams' testimony adds that Davis never struck defendants or threatened them with a knife. Williams was also able to testify that Davis remained unconscious until he was moved by Dillon and Kentris. While defendants' testimony suggested that they acted only in self-defense, the trial court was under no obligation to believe their testimony over that of Ashmon and Williams. Where the record discloses evidence sufficient to sustain a conviction on a charge of murder and also on a charge of voluntary manslaughter, a finding of guilty on the lesser charge will not be disturbed unless palpably contrary to the evidence. (*People v. Stepheny* (1966), 76 Ill.App.2d 131, 221 N.E.2d 798.) Here, the record does not establish that the testimony of the witnesses to the altercation resulting in Davis' death was so improbable, unreasonable or unsatisfactory as to necessitate setting aside the court's credibility finding. (*People v. Robinson* (1969), 113 Ill.App.2d 89, 251 N.E.2d 766.) There was ample evidence, if believed, to support the court's finding of voluntary manslaughter. It was for the trial judge to weigh the evidence and evaluate the witnesses; we will not now disturb that finding. See *People v. Dockery* (1966), 72 Ill.App.2d 345, 219 N.E.2d 687.

■ Defendants make much of the fact that Ashmon in his testimony at trial denied that Williams had any part in Davis' death while in three earlier statements he had accused Williams of the murder. Defendants also point to their own testimony indicating that Williams took part in the attack on Davis. We note the observation made by the court in *People v. Mullins* (1963), 28 Ill.2d 412, 416-417, 192 N.E.2d 840, 843:

> "Some of the apparent contradictions and unresolved discrepancies in the record appear to be due to the efforts of [the co-indictees] to minimize the extent of their own participation in the crime."

The court went on to conclude that despite this admitted "interest" in coloring their testimony, the trial court did not err in basing a conviction for murder upon this testimony. In the instant case, the trial court specifically stated that Williams had participated in the beatings. Despite

this knowledge, the trial court found Williams' testimony as to the participation of defendants believable. Even assuming that Williams did, in fact, participate in the beatings, this, by itself, would not exculpate defendants. (*People v. Reader, supra.*) We conclude that despite Williams' probable participation in the beatings, the trial court could properly rely on his testimony regarding the participation of defendants.

■■■ In this regard, defendants contend that, because all charges against Williams were dropped in return for his testimony against defendants, his testimony should be accorded no weight. However, it is clear that the fact alone that an accomplice has been granted leniency does not necessarily require that his testimony be disregarded. (*People v. Williams* (1959), 17 Ill.2d 193, 199-200, 161 N.E.2d 295, 299.) Although the testimony of an accomplice must be scrutinized with extreme care and acted upon with the utmost caution, it should not be set aside unless it is plainly apparent to the reviewing court that defendant was not proven guilty beyond a reasonable doubt. (*People v. Nitti* (1956), 8 Ill. 2d 136, 133 N.E.2d 12.) Moreover, the testimony of another credible witness entitles the accomplice's testimony to additional weight. (*People v. Scott* (1971), 3 Ill.App.3d 309, 278 N.E.2d 529.) Despite the fact that, as here, the witness is a co-indictee who has been promised consideration in his own case and despite the fact that, as here, there are inconsistencies in his testimony, if his testimony is corroborated by other witnesses, the court may properly base a finding of guilty on that testimony. *People v. Anderson* (1973), 14 Ill.App.3d 925, 303 N.E.2d 793.

With these legal principles in mind, we have carefully reviewed the entire record, and despite the admitted bias Williams might have, we find his testimony, taken together with that of Ashmon, sufficient to sustain a conviction for voluntary manslaughter.

Defendants next complain of the State's failure to call certain witnesses. Defendants note that the two police officers who visited the apartment after the altercation and one Mary Hines[3] were never called as witnesses by the State. Defendants conclude that this raises an inference that their testimony would have been unfavorable to the State's position.

■■ While it is true that circumstances can exist where the failure of the State to call known and available witnesses will lead to an adverse inference, the general rule is that the State is not obligated to call all witnesses to a crime, and no adverse inference will arise from the failure to do so. (*People v. Tornabene* (1974), 18 Ill.App.3d 836, 310 N.E.2d

---

[3]Although Williams testified that a Mary Hines was present in the Kentris apartment when he arrived at 8:40 P.M., there was no testimony that she was still present either during the altercation or afterward. She was never mentioned again by any witness and consequently, it is impossible to determine exactly who she was.

708.) It is only necessary for the State to call as many witnesses as it believes necessary to prove defendants guilty beyond a reasonable doubt. *People v. Adorno* (1970), 126 Ill.App.2d 98, 261 N.E.2d 443.

■■ In the instant case, since the police officers arrived only after the altercation, their relevant testimony would have been limited to describing Davis' condition while he was on the couch. However, their examination of Davis, as described by the various witnesses, was, at best, cursory. Moreover, Davis' condition after the fight had already been described by Ashmon and Williams, both of whom had a far better opportunity to assess his condition. Since the officers' testimony would have been merely cumulative, no negative inference can be drawn by the State's failure to call them as witnesses. (*People v. Hickman* (1973), 9 Ill.App.3d 601, 291 N.E.2d 872.) Finally, it is clear that the State cannot be expected to call as witnesses persons whom it cannot identify. (*People v. Cansler* (1971), 132 Ill.App.2d 19, 267 N.E.2d 136.) In the case at bar, the witnesses were unable to name or identify the police officers. And the prosecution explained to the trial court that the police department no longer had a record of police calls made that day. Consequently, it was not possible to locate or identify the officers involved. There cannot be any negative inference from failure to call witnesses when their absence is adequately explained. (*People v. Gonzales* (1969), 43 Ill.2d 110, 251 N.E.2d 169.) We conclude that there was no duty on the State to call the police officers as witnesses.

Defendants also complain of the State's failure to call Mary Haines who was present when Williams arrived at the Kentris apartment. We first note that there was no testimony that Mary Hines was still present either during or after the altercation. However, even assuming that she was, there was no burden on the State to call her as a witness.

Since Mary Hines was allegedly present at the party, she was as known and available to the defendants as to the State. Since defendants also failed to call her, they are in no position to claim prejudice by the failure of the State to use her testimony. (See *People v. Nowak* (1970), 45 Ill.2d 158, 258 N.E.2d 313.) Moreover, the State had already called two eyewitnesses to the altercation; consequently, it was not necessary to call all possible remaining eyewitnesses. (*People v. Jones* (1970), 121 Ill. App.2d 268, 257 N.E.2d 514.) Here, the State had presented testimony of an unprovoked attack on Davis; defendants had presented testimony regarding self-defense and a third party. There was sufficient evidence for the trial court to base a finding; hence, the State was not required to call any additional witnesses. See *People v. Pearson* (1972), 4 Ill.App.3d 462, 281 N.E.2d 422.

Defendants' final contention is that there was insufficient evidence to

support their convictions for voluntary manslaughter. Defendants argue that the evidence could only result in one of two conclusions; either they were guilty of murder or they acted in self-defense.

In relevant part, the Criminal Code defines the crime of voluntary manslaughter as follows:

"A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." Ill. Rev. Stat. 1971, ch. 38, par. 9—2(b).

Section 7—1 provides:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." Ill. Rev. Stat. 1971, ch. 38, par. 7—1.

■■■■ A jury having been waived, it is the province of the trial judge to determine from the facts and circumstances whether defendants acted in self-defense, or, if not in self-defense, whether the circumstances attending the act were such that the killing constituted murder, manslaughter, or justifiable homicide. *People v. Young* (1973), 11 Ill.App.3d 609, 297 N.E.2d 298.

In the instant case, the State presented evidence that after excessive drinking, defendants, in an unprovoked attack, beat Vernon Davis so severely that he never regained consciousness, and ultimately died. Defendants admitted striking Davis, but claim they did so only in response to Davis' attack on them with a knife. However, according to James, he continued to strike Davis even after Davis had dropped his knife. A knife was never recovered. Both defendants claim that Williams also attacked Davis but there is some dispute whether Davis was already unconscious at that time. There was also testimony that Williams had had an earlier altercation with Davis involving a knife, and that James and Davis were "joking" about their dual relationship with Louella Kentris.

It is for the trier of fact to determine which witness was telling the truth. (*People v. Dockery, supra.*) The trial judge, as finder of fact, was not required to accept or reject the testimony of any witness in toto. *People v. Young, supra.*

We agree with defendants that the evidence was such that they could have been found guilty of murder, but depending on what testimony is believed, the evidence established the offense of voluntary manslaughter as well. The trial court could have concluded that there was an altercation between Davis and defendants; that Davis did not have a knife, but did threaten defendants; that defendants, due to excessive drinking, may have believed that their conduct was necessary; but that their belief was unreasonable. (*People v. Young, supra.*) Or the trial court could have concluded that Davis did have a knife, but that due to his excessive drinking, he did not pose a deadly threat to defendants; that defendants, due to excessive drinking, may have believed that their conduct was necessary; but that their belief was unreasonable. (*People v. Martinez* (1972), 4 Ill. App.3d 1072, 283 N.E.2d 268.) Or the trial court could have concluded that Davis did have a knife; that Davis dropped the knife; that defendants continued to beat Davis; that his conduct was excessive; that this amount of force was unreasonable. In this sense the hunter could have become the hunted. *People v. Scott* (1970), 123 Ill.App.2d 107, 259 N.E. 2d 594; *People v. Galarza* (1972), 3 Ill.App.3d 853, 279 N.E.2d 372.

We conclude there was ample evidence on which to base a finding of voluntary manslaughter.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS and LEIGHTON, JJ., concur.