THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM SNOW, Defendant-Appellant.

Second District   No. 2—83—-0631

Opinion filed June 13, 1984.

G. Joseph Weller, Paul J. Glaser, and Michael Braun, all of State Appellate Defender's Office, of Elgin, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and Phyllis J. Perko and Raymond L. Beck, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE NASH delivered the opinion of the court:

After a bench trial defendant, William Snow, was convicted of armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2), residential burglary (Ill. Rev. Stat. 1981, ch. 38, par. 19—3(a)), home invasion (Ill. Rev. Stat. 1981, ch. 38, par. 12—11(a)(1)), and armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)). Defendant was sentenced to concurrent terms of imprisonment of seven years for armed robbery, seven years for home invasion and five years for residential burglary. The issues presented for review are (1) whether defendant was proved guilty beyond a reasonable doubt of home invasion and residential burglary; (2) whether the State proved defendant had the intent to commit theft at the time he entered the house; (3) whether the residential burglary conviction must be vacated on one-act, one-crime principles; and (4) whether this cause must be remanded for a new sentencing hearing.

Each of defendant's convictions was related to the entry by defendant and Michael Nord, who was tried separately, into a rented house in which Bill Olsen, John Payne and three other men resided. The home invasion charge alleged that defendant knowingly and without authority entered the home with knowledge that it was occupied and, while armed with a wooden club, threatened the imminent use of force against John Payne. The residential burglary charge alleged that defendant knowingly and without authority entered the home with an intent to commit theft. The armed robbery charge alleged that defendant, while armed with a wooden club, took guns and a stereo receiver from the presence of Bill Olsen by threatening the imminent use of force.

Bill Olsen testified in trial that on October 30, 1982, he, John Payne and three other men lived in a house they had rented from John Hingyi. Olsen heard a knock on his ground-floor bedroom window at 4 a.m. and observed Michael Nord outside the window. Nord asked where John Hingyi was and stated, ''We are not fooling around, punk. We've got a gun.'' Olsen then heard a clicking noise sounding like the mechanism of a gun. Olsen testified he believed Nord was accompanied by another person because he could see Nord and he was not making the noise with the suspected gun. Olsen told Nord that John Hingyi did not live there and when Nord asked if anyone else

was in the house, Olsen advised him that he believed he was alone. A car then drove up and its occupant entered the house. When Nord directed Olsen to determine who it was, he went upstairs, then returned and told Nord it was his roommate, John Payne. He and Nord continued to talk for about five minutes through the window, during which time Nord repeated the threat, "we have a gun." When Nord told Olsen "they" were coming into the house, Olsen headed towards the unlocked front door. Olsen testified that as he reached it the door was pushed open and he grabbed the knob and opened it the rest of the way. Olsen agreed he had not offered any physical or verbal objection to the entry, testifying that he believed there wasn't much else he could do and that he gave no permission to enter.

Michael Nord came through the door first and pointed a shotgun at Olsen and Payne. Defendant followed Nord into the house carrying a 32-inch-long axe handle. Olsen knew defendant as he had visited the house on prior occasions. Nord wore a nylon mask or stocking over his head, and defendant wore a black knit cap pulled over his eyebrows. Olsen testified he told Payne that the men wanted John Hingyi and weren't bothering us, and that he then just stood there and did what he was told. Defendant asked if Hingyi was there and if they were friends of his and Olsen replied that Hingyi was not in the house and did not live there anymore. Defendant then told Olsen and Payne not to fool around with them and inquired where Michael O'Reilly's room was located. The four men then went upstairs to O'Reilly's bedroom with Nord and defendant walking behind Olsen and Payne with the shotgun pointed at their backs. Defendant and Nord directed the others to enter a bathroom across the hall from O'Reilly's bedroom where they stayed for about five minutes before coming out after hearing a car drive away. While in the bathroom Olsen heard glass breaking; he also heard either Nord or Snow say, "Stay in the bathroom, punks. If you move, you're dead." When defendant and Nord left, Payne and Olsen went to O'Reilly's room, where they noticed that a glass china cabinet had been smashed, drawers emptied and O'Reilly's three shotguns, BB guns, two handguns and stereo receiver were gone.

John Payne testified that he returned home at about 4 a.m. and spoke briefly with Olsen, then went into a bathroom where he removed his contact lenses. As he came out of the bathroom he saw Olsen open the door and two people enter the house. Because he was not wearing his contact lenses, Payne was unable to identify those persons. The man with the shotgun pointed it at Payne and said, "[d]on't move or you're dead"; he then unplugged the telephone in

the living room. The man with the axe handle hit Payne's dog with it. Payne testified further that just before he and Olsen were placed in the bathroom both men advised them that if they came anywhere near the door they were dead; similar threats were repeated after the two were placed in the bathroom.

Police officer Donald McCombe testified he arrested defendant at his home and was given permission to search his bedroom. Defendant advised the officer he was innocent and had nothing to hide and stated Michael Nord set him up and that there were two BB guns that Nord had given him in his room. The guns were found in a closet under a pile of clothes and were identified at trial as the property of Michael O'Reilly.

At the police station, defendant was advised of his *Miranda* rights and gave a statement to the officers in which he admitted his presence at the house. The officers testified defendant told them he and Nord had been at a party the evening before and that Nord persuaded defendant to drive him to John Hingyi's house in defendant's car. Nord did not explain why he wanted to go there, but defendant assumed it was to collect a debt as he knew O'Reilly and Hingyi owed Nord money. When they arrived at the house Nord took a piece of wood from the car's trunk and defendant took an axe handle. The two men went to the back of the house where Nord talked to one of the residents; defendant did not participate and stood off to the side of the window. Shortly thereafter Nord went to the home's front door with defendant following and the two went inside. Defendant told the officers the man with whom Nord had talked must have been a little crazy not to run to the front door and lock it before Nord got there. Defendant also told the officers that the only thing he recalled having said when in the house was to ask Payne and Olsen if they knew anything about what happened to his car, which was parked in the garage. He was unsure if he had made any threats, but might have done so because he thought Nord was crazy and might do something bad. Defendant also told the officers that he watched Nord go into the bedroom and take several guns and a stereo receiver down to the car.

Officer Francis Marrocco testified to the same matters as did Officer McCombe and recalled further that defendant had said he had helped Nord take the property out of the house and had also told the officers he was angry about the incident because he did not obtain any money.

Michael O'Reilly testified that when he returned home after 4 a.m. on October 30, he found that his room had been ransacked, the china closet smashed and guns and a stereo were missing. No one had

been given permission to take these items. O'Reilly was aware of a dispute between Snow and Hingyi over damage to a car and the title to that car.

Defendant testified in his own behalf that he and Nord had been to a Halloween costume party the evening before entry into the home and Nord had worn the nylon stocking over his head most of the evening. At the party Nord persuaded defendant to drive him to the house in which he and defendant believed John Hingyi still lived. Defendant testified that Hingyi owed him $500 and title to a car which defendant had purchased from him about 18 months earlier. Hingyi, who still had possession of the car, had put off delivering the car's title to defendant. Prior to that night defendant had heard that someone had damaged the car by shooting into it and stated that he only went to the house to obtain what Hingyi owed him and had no idea Nord would steal anything.

Defendant further testified that when he got to the house Nord suggested they go around the back to see if anyone was home. Defendant did so, but he was 10 feet from the back window and did not hear what Nord said to Olsen. After this conversation Nord picked up a 24-inch long board on the ground and instructed defendant to do the same with an axe handle lying there because there might be trouble inside. Defendant testified he feared there would be an argument because five people lived in the house and he had, on an earlier visit, been beaten up by them. Defendant denied that Nord had a gun.

Defendant also testified that when he and Nord reached the front porch he saw Olsen opening the front door and Nord opened the screen door and they both walked in. Nord then asked Payne and Olsen if Hingyi or O'Reilly were there, and defendant asked them if they knew who had shot into his car. Nord then ordered the two into the bathroom and threatened to kill them if they came out. Defendant denied having threatened Payne and Olsen or having any prior notice from Nord that he intended to threaten anyone for any purpose. Nord then went into O'Reilly's bedroom and told defendant he was going to take what O'Reilly and Hingyi owed him. Defendant testified he did not want to be involved and walked out of the house and Nord followed carrying the stolen property. Defendant testified that he permitted Nord to place the property in his car only because Nord pointed one of the guns at him. The two BB guns were left at defendant's house because Nord said he could not sell them.

Defendant testified that he did not know that his entry into the house was unauthorized and that he had not intended to commit a

theft when he entered. He denied telling the officers that he had heard Nord's threats to Olsen outside the window of the house.

It was stipulated that defendant had been convicted of burglary in 1979 and 1981.

■ Defendant contends first he was not proved guilty of home invasion or residential burglary because the evidence was insufficient to establish that he entered the house without authority, arguing that he and Nord were allowed to enter the house by one of its occupants, Bill Olsen. While defendant acknowledges Olsen testified he had not believed there was anything he could have done to stop the entry, defendant asserts Olsen's failure to explicitly testify that he had been intimidated into allowing the entry, his failure to lock the door and his failure to arm himself with one of the guns present in the house, or otherwise bar the entry, negates Olsen's testimony he had not authorized entry.

It is established that the State must prove in a prosecution for home invasion and residential burglary that entry into a house was made without authority. (*People v. Hudson* (1983), 113 Ill. App. 3d 1041, 1045, 448 N.E.2d 178, *appeal denied* (1983), 96 Ill. 2d 545; *People v. Scott* (1982), 108 Ill. App. 3d 607, 612, 439 N.E.2d 130.)·It is also well established that a reviewing court ordinarily will not substitute its judgment for that of the trier of fact and that it was the function of the trial court to weigh the evidence, resolve any conflicts or inconsistencies therein and assess the credibility of witnesses. (*People v. Lanasa* (1983), 113 Ill. App. 3d 516, 521, 447 N.E.2d 1002; *People v. Ortiz* (1981), 96 Ill. App. 3d 497, 501, 421 N.E.2d 556.) Only when the judgment is so improbable or palpably contrary to the evidence as to raise a reasonable doubt of guilt will a reviewing court reverse. *People v. Fox* (1983), 114 Ill. App. 3d 593, 597-98, 449 N.E.2d 261, *appeal denied* (1983), 96 Ill. 2d 544.

There was evidence that Michael Nord, armed with a shotgun, and defendant, armed with an axe handle, entered a private home at 4 a.m. after Nord had threatened one of its occupants outside the rear bedroom window and advised him that they had a gun. Nord then told Olsen "they" were coming into the house, and Olsen arrived at the front door just as Nord started to open it. In these circumstances it may not be inferred that Olsen authorized entry by defendant and Nord because he failed to resist it; there was little else Olsen could have done. The trial court also expressly rejected defendant's testimony that he was too far from the bedroom window to have heard Nord threaten Olsen, observing that he did not consider defendant's testimony credible. We note, too, defendant testified that he had

expected an altercation in the home and armed himself for that reason; it would be unrealistic in these circumstances to consider that defendant's entry was authorized by the occupants of the home.

■ Defendant next contends the State failed to prove he had the requisite intent to commit theft at the time he entered the house and his conviction for residential burglary must, therefore, be reversed. Defendant points to evidence of a dispute between himself and John Hingyi, whom defendant believed lived at the house, over money Hingyi owed defendant and a car defendant had purchased from him which had been damaged while in Hingyi's custody. Michael Nord also had a dispute with Hingyi and O'Reilly over money owed him. Defendant asserts the evidence only shows he entered the house to settle a grievance with Hingyi and the theft which occurred therein by Nord was a spontaneous act on his part to settle a claim of debt.

To sustain the conviction for residential burglary the State was required to prove that defendant unlawfully entered the home with an intent to commit theft. (*People v. Vallero* (1978), 61 Ill. App. 3d 413, 415, 378 N.E.2d 549.) As evidence of intent is usually not direct, it may be proved circumstantially by inferences reasonably drawn from the circumstances of defendant's conduct. (*People v. Johnson* (1963), 28 Ill. 2d 441, 443, 192 N.E.2d 864.) The fact that property is taken after entry is evidence that the requisite intent existed at the time of entry. (*People v. Franceschini* (1960), 20 Ill. 2d 126, 130, 169 N.E.2d 244.) Moreover, in the absence of contradictory evidence, an unlawful entry into a building which contains personal property which could be the subject of theft gives rise to an inference that entry was made for that purpose. (*People v. Johnson* (1963), 28 Ill. 2d 441, 192 N.E.2d 864; *People v. Davis* (1977), 54 Ill. App. 3d 517, 523, 369 N.E.2d 1376.) It has also been held that evidence a defendant after entry, swiftly and methodically proceeded to restrain the home's occupants and then take property from the home, supports an inference that the entry was made with the intent to commit theft. *People v. Fisher* (1980), 83 Ill. App. 3d 619, 622, 404 N.E.2d 859.

While defendant testified his entry was solely for the purpose of settling his grievance with John Hingyi and that he had no intent to commit a theft, the trial court did not believe that testimony and also found significant the fact defendant assisted Nord in taking property from O'Reilly, a person with whom defendant never claimed to have a dispute. We note, too, defendant's statement to the police officers after his arrest that he was angry because he had been unable to obtain any money that night.

We conclude the evidence was sufficient to prove that at the time

of entry defendant intended to settle his debt by stealing property found in the house. It is apparent he was prepared to settle his grievance with force, and did so by threat of force. The finding by the trial court is not so improbable or palpably contrary to the evidence as to allow this court to reverse it (see *People v. Fox* (1983), 114 Ill. App. 3d 593, 597-98, 449 N.E.2d 261, *appeal denied* (1983), 96 Ill. 2d 544), and the evidence supports the trial judge's finding that defendant entered the home both without authority and with the intent to commit a theft.

■ Defendant next contends that the residential burglary conviction, if not reversed for lack of evidence, must be vacated either because it and the home invasion conviction were based on the same act of unlawful entry, or because it was based upon and arose from the same conduct as resulted in his conviction for armed robbery. To support his argument that residential burglary and home invasion are based on the same physical act, defendant relies on *People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011. In that case, where the State confessed error, the court held that as the same physical act of entry constituted the basis for both burglary and home invasion, vacation of the burglary conviction was required. (108 Ill. App. 3d. 880, 890.) The State does not confess error in the present case, but offers *People v. Pavic* (1982), 104 Ill. App. 3d 436, 432 N.E.2d 1074, for the proposition that both convictions are proper because neither is the lesser-included offense of the other.

While we agree that residential burglary is not a lesser-included offense of home invasion, we recognize that defendant's argument does not rest on a lesser-included-offense analysis, but rather, whether under *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, one conviction must be vacated because both were based upon the same physical act.

In *King*, the supreme court held that:

"Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a difference offense. We hold, therefore, that when more than one offense arises from a series of inci-

dental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (*People v. King* (1977), 66 Ill. 2d 551, 566.)

Thus, if one of two offenses is not a lesser-included offense of the other, both convictions may stand unless each is "carved from the same physical act."

It cannot be said, however, that home invasion and residential burglary are based upon the same physical act, only that they share the physical act of entry; while residential burglary is complete once an unlawful entry is made with the requisite intent (*People v. Wilfong* (1979), 72 Ill. App. 3d 268, 272, 390 N.E.2d 934), home invasion is not complete until, after an unlawful entry, defendant either uses force or threatens use of force upon a person in the home while armed with a dangerous weapon, or intentionally causes any injury to a person in the home. (Ill. Rev. Stat. 1981, ch. 38, par. 12—11(a).) In *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180, the court considered whether multiple convictions, each of which were based upon separate blows, were proper where the defendant argued that the term "act" under *People v. King* (1977), 66 Ill. 2d 551, was intended to include all blows during one beating. The court held that multiple convictions were proper because the separate blows, even though closely related, were not one physical act and their interrelationship did not preclude multiple convictions and concurrent sentences for separate offenses which are not lesser-included offenses. In doing so, the court reiterated *King's* definition of "act" as " 'any overt or outward manifestation which will support a different offense.' " *People v. Dixon* (1982), 91 Ill. 2d 346, 355.

We conclude that the offenses of residential burglary and home invasion are not based on the same physical act as the common element of unlawful entry does not complete the offense of home invasion. The fourth district, in a case subsequent to *People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011, adopted the same reasoning. See *People v. Rathgeb* (1983), 113 Ill. App. 3d 943, 949, 447 N.E.2d 1351.

■ Defendant's similar argument that his residential burglary conviction must be vacated because it was based upon or arose from the same conduct as did the armed robbery conviction is also without merit. He relies upon *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819, as controlling on the question. The court in that case did hold that a burglary conviction based upon an entry with intent to commit a theft must be vacated if the defendant was also convicted of committing an armed robbery inside the home, because the entry was

made with the purpose of committing a theft by means of armed robbery, that is to say, the two offenses were not independently motivated. (60 Ill. 2d 1, 13-14.) However, in *People v. King* (1977), 66 Ill. 2d 551, the court considered *People v. Williams* (1975), 60 Ill. 2d 1, 322, N.E.2d 819, and abandoned the independent motivation test insofar as it applied to separate convictions for which concurrent sentences were imposed. (66 Ill. 2d 551, 560, 564, 565-66.) Since armed robbery and residential burglary are not based on the same physical act, and neither is a lesser-included offense of the other, both convictions may stand where concurrent sentences are imposed. (See *People v. Graves* (1977), 54 Ill. App. 3d 1027, 1034, 370 N.E.2d 1219; *People v. Coleman* (1977), 50 Ill. App. 3d 40, 43, 365 N.E.2d 246, *appeal denied* (1977), 66 Ill. 2d 639.) Defendant has not sought review of his conviction for armed robbery.

In view of our conclusion that defendant's conviction for residential burglary will not be vacated, we need not consider the argument that he should be given a new sentencing hearing.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

LINDBERG and UNVERZAGT, JJ., concur.