THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES JONES, Defendant-Appellant.
First District (5th Division) No. 85—0462

Opinion filed September 26, 1986.

134

PINCHAM, J., dissenting.

Steven Clark and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Dean P. Karlos, and Rosanne T. Ossey, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a bench trial defendant, James Jones, was found guilty of armed robbery, armed violence, home invasion and residential burglary. Judgment was entered on the armed-robbery, home-invasion and residential-burglary counts, and defendant was sentenced to serve six years in the Illinois Department of Corrections. On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt, that the trial court erred in denying his motion to suppress the identification testimony, and that the court erred in convicting him of both home invasion and residential burglary.

Prior to trial, defendant moved to suppress the identification testimony of Cyrus Carey, the only witness who was able to identify him. The parties agreed to conduct the hearing on the motion simultaneously with the trial.

Cyrus Carey (Cyrus) testified that on March 1, 1984, he was working as a tailor in his third-floor apartment at 7466 North Damen in Chicago. His brother, Garth Carey, and a friend, Leon Smith, were also present. At approximately 12:45 'p.m. on March 1, 1984, someone knocked at the apartment door. When Cyrus opened the door, he saw two men pointing guns at him. Both men told Cyrus to "freeze." The shorter of the two men was holding a revolver and the taller man was holding a shotgun. In court, Cyrus identified defendant as the man

with the revolver. He testified that he recognized defendant on March 1, 1984, because he had seen him in the hallway of his apartment building two weeks earlier. Although Cyrus stated that he had told the police that he had seen defendant on a prior occasion, the parties stipulated that he had not done so.

Cyrus tried to close the door but the two men forced their way into his apartment. Defendant then pulled a mask over his face. In court, Cyrus described the mask as a dark, navy blue stocking. He stated that People's exhibit No. 1, a black nylon stocking with a knot and a hole, looked like the mask which defendant was wearing. The parties stipulated that the police recovered People's exhibit No. 1 from defendant's pocket following his arrest on March 9, 1984. At the preliminary hearing, Cyrus testified that he had told the police that the stocking was blue. At trial, he described the color of People's exhibit No. 1 as black or navy blue.

Cyrus testified further that the two armed men ordered him to lie on the floor and asked him whether there were any other persons in the apartment. Cyrus' brother, Garth Carey, was lying on a bed in the living room and his friend, Leon Smith, was standing in another room. The men made Garth Carey and Leon Smith lie down on the floor next to Cyrus Carey and covered all three men with some sewing material. Cyrus testified that he observed the two offenders for approximately two minutes before he was covered. The men asked Cyrus for money but he told them that he did not have any. They then took his watch and wallet and broke into his sister's locked bedroom where they took her gold jewelry and approximately $20 in cash. The Careys' sister was not at home at the time of the robbery.

After Cyrus had been lying on the floor for about 12 minutes, he heard someone knocking at the door and calling his nickname, "Tailor." The robbers opened the front door and told Errol Nugent to enter. Nugent testified that the taller man was carrying a shotgun and was wearing blue-jean coveralls; the shorter man was holding a .38-caliber handgun and was wearing a mask. When the man with the revolver ordered Nugent to come into the apartment, he jumped over the railing in the third-floor hallway, landed on the second floor and fled downstairs and out of the building. Nugent identified People's exhibit No. 1 as the mask which the man with the handgun was wearing. On cross-examination, Nugent described the mask as a blue stocking mask. Cyrus Carey heard Nugent run downstairs. The robbers then ran out of the back of the apartment.

Garth Carey's testimony corroborated his brother's testimony. Garth, however, could not identify the man with the handgun because

he was wearing a mask which "could have been" People's exhibit No. 1. Garth described the mask as a blue ski mask. The parties stipulated that two investigators interviewed Cyrus Carey, Garth Carey, Leon Smith and Errol Nugent within one hour of the robbery and that their report of their interviews with the witnesses contained no references to a "black stocking."

On cross-examination, defense counsel questioned Cyrus Carey about a possible third offender:

"QUESTION: Sir, did you see anybody in the company of these two men with guns? Was there anybody else with them or behind them?

ANSWER: No, I don't remember.

QUESTION: There wasn't a woman with them?

ANSWER: No, I'm not sure about the woman.

QUESTION: Might there have been a woman with them?

ANSWER: Could, but I'm not sure.

QUESTION: Did you tell the police there was a woman with these two guys?

ANSWER: No, no.

QUESTION: But there was a chance there was?

ANSWER: Maybe, I don't know. I didn't see a woman.

QUESTION: Did the woman enter the apartment?

ANSWER: No.

QUESTION: At least you didn't hear her come into the apartment, is that right?

ANSWER: Right, I didn't.

QUESTION: Did you tell the police there might have been a woman with these guys?

ANSWER: No, no.

QUESTION: Did you tell the police what the woman looked like?

ANSWER: I'm not sure. That was so long ago. I'm not sure if a woman was there. I saw two guns, you know, pointing at me.

QUESTION: That's all you saw, two guns?

* * *

ANSWER: I couldn't see after the two guns was [sic] pointing at me if there was a woman. I was frightened, scared, you know, at the time, if there, there might, could have been a woman there."

On March 3, 1984, Cyrus Carey examined several books of photographs and identified defendant's photograph. On March 4, 1984, Ca-

rey signed a complaint for preliminary examination charging defendant with armed robbery. Based on that complaint, a warrant was issued for defendant's arrest. Defendant was apprehended on March 9, 1984. On the following day, Carey identified defendant in a lineup.

At the conclusion of the State's case, the court considered defendant's motion to suppress Cyrus Carey's identification testimony. The State waived a formal swearing of defendant to the allegations in the motion. Defense counsel asked that the two photographs of the March 10, 1984, lineup be attached to the motion to suppress and then rested on the motion which the court denied.

Defendant testified in his own behalf and denied that he had robbed Cyrus Carey on March 1, 1984. Although defendant could not recall at trial whether he was working as a general contractor on the date of the offenses, he admitted that he had told the police that he was working. On cross-examination, defendant explained that he had told the police that on March 1, 1984, he was working at the home of his uncle, Joe Davis, at 2037 Darrow in Evanston, and at the home of his aunt, Julia Smith, at 2112 Darrow in Evanston. One job ended before noon and the other one lasted until 4:30 in the afternoon. Defendant admitted that after the police telephoned his relatives, who apparently failed to corroborate his alibi, he told the police that he could not remember where he was on March 1, 1984. The parties stipulated that if Julia Smith were called to testify, she would state that defendant worked for her sometime during the month of February 1984. On cross-examination, defendant also stated that at the time of his arrest, he was wearing People's exhibit No. 1 on his hair because he had just had his hair braided. He acknowledged that the stocking had a hole in it.

Defendant was found guilty of armed robbery, armed violence, home invasion and residential burglary. Judgment was entered on the armed-robbery, home-invasion and residential-burglary counts, and defendant was sentenced to serve six years in the Illinois Department of Corrections. This appeal follows.

# I

Defendant initially contends that he was not proved guilty beyond a reasonable doubt. Defendant submits that Cyrus Carey's identification testimony was not credible because he did not know whether a woman was present with the two men who robbed him, he was frightened and scared when he saw the two guns pointed at him, he had only a brief opportunity to observe the man with the revolver before he pulled a mask over his face, he took several minutes to identify

defendant at the lineup and he was impeached when he testified that he had told the police that he had seen the man with the revolver on an earlier occasion. Defendant also discounts the significance of the black nylon stocking which the police recovered from defendant's pocket upon his arrest because none of the State's witnesses could positively identify the stocking, and the trial judge, in denying defendant's motion for a directed finding, commented that he did not know whether the exhibit was the mask worn by the perpetrator and expressed some doubt as to whether the recovered stocking was the mask used in the robbery.

In finding defendant guilty, the trial court specifically found that Cyrus Carey testified honestly and that he had an adequate opportunity to observe defendant when he was unmasked.

■ Upon our review of the record, we cannot say that these findings were in error. Carey observed defendant at the entrance to his apartment long enough to recognize him as a man whom he had seen less than two weeks before in the same hallway. He stated also that when he opened the door defendant's face was uncovered and that defendant did not pull the mask over his face until after he entered the room. Carey also stated that he was able to view the men for "approximately two minutes." It is not required that the time for observation be of a prolonged nature (*People v. Nurse* (1985), 131 Ill. App. 3d 590, 596, 475 N.E.2d 1000), and we believe that in the instant case Carey had an adequate opportunity to view defendant (*People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907; *People v. Green* (1976), 42 Ill. App. 3d 978, 356 N.E.2d 947; *People v. Norfleet* (1973), 15 Ill. App. 3d 567, 304 N.E.2d 672; *People v. Bell* (1975), 29 Ill. App. 3d 1032, 331 N.E.2d 258). Carey's understandable fear when he saw two guns pointed at him does not necessarily render his identification testimony unworthy of belief. Carey's identification of defendant was strong and corroborated by his identification of defendant's photograph on March 3, 1984.

We have carefully reviewed the cross-examination of Carey in which defense counsel raised the issue of a possible third offender, and we are unable to conclude that Carey's testimony on this matter casts doubt on his identification of defendant. Carey testified that he did not see a woman with the two men, that no woman entered the apartment with them, that he never told the police that there was a woman with the two men, and that he did not remember whether there was a third person with the other two offenders.

■ Our supreme court has repeatedly held that a positive identification by a single witness with ample opportunity to observe is suffic-

ient to sustain a conviction. (*People v. Williams* (1975), 60 Ill. 2d 1, 12, 322 N.E.2d 819; *People v. Clarke* (1971), 50 Ill. 2d 104, 110, 277 N.E.2d 866.) Upon our review of the record, we are satisfied that Cyrus Carey's in-court identification of defendant was sufficient to establish defendant's guilt beyond a reasonable doubt. In light of Carey's testimony, the trial judge, sitting as the trier of fact, was not required to accept defendant's denial of his participation in these offenses.

## II

Defendant next contends that the trial court erred in denying his motion to suppress the identification testimony. Specifically, defendant argues that the lineup-identification testimony should have been suppressed on the ground that defense counsel was not present at the lineup. While the State responds that this argument has been waived by defendant's alleged failure to support the motion with an affidavit, we note that the State waived formal swearing of defendant to the allegations in his written motion which raised the same issue defendant advances on appeal. See *People v. McAdrian* (1972), 52 Ill. 2d 250, 287 N.E.2d 688.

■■ ■ The right to counsel guaranteed by the sixth amendment attaches at the time that "adversary judicial criminal proceedings" are initiated against a person by way of formal charge, preliminary hearing, indictment, information or arraignment. (*Kirby v. Illinois* (1972), 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82; *People v. Burbank* (1972), 53 Ill. 2d 261, 272, 291 N.E.2d 161.) In the case at bar, the preliminary hearing, the filing of the information and the arraignment all occurred after the date on which defendant was identified in the lineup. Defendant, however, maintains that the lineup identification should have been suppressed because the issuance of an arrest warrant following the filing of a criminal complaint and the defendant's subsequent arrest pursuant thereto constituted a "formal charge" and thereby activated his constitutional right to have counsel present during the lineup.

To date, neither the United States Supreme Court (see *Edwards v. Arizona* (1981), 451 U.S. 477, 480 n.7, 68 L. Ed. 2d 378, 383 n.7, 101 S. Ct. 1880, 1883 n.7), nor the Illinois Supreme Court (see *People v. Owens* (1984), 102 Ill. 2d 88, 101, 464 N.E.2d 261), has decided whether the sixth amendment right to counsel automatically attaches upon the filing of a criminal complaint. We recognize that there is a sharp split of authority in the appellate court opinions on this question. (Compare *People v. Dove* (1986), 147 Ill. App. 3d 659, 662-64;

*People v. Fleming* (1985), 134 Ill. App. 3d 562, 566-69, 480 N.E.2d 1221; *People v. Curtis* (1985), 132 Ill. App. 3d 241, 245-48, 476 N.E.2d 1162;[1] *People v. Jumper* (1983), 113 Ill. App. 3d 346, 349, 447 N.E.2d 531; *People v. Faulkner* (1980), 86 Ill. App. 3d 136, 138-39, 407 N.E.2d 126; *People v. Giovanetti* (1979), 70 Ill. App. 3d 275, 282, 387 N.E.2d 1071; *People v. Marshall* (1977), 47 Ill. App. 3d 784, 786, 365 N.E.2d 367; and *People v. Hinton* (1974), 23 Ill. App. 3d 369, 371-72, 319 N.E.2d 313 (sixth amendment right to counsel automatically attaches upon the filing of a criminal complaint), with *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 130-31, 476 N.E.2d 1179; *People v. Boswell* (1985), 132 Ill. App. 3d 52, 57-60, 476 N.E.2d 1154; *People v. Mitchell* (1983), 116 Ill. App. 3d 44, 47, 451 N.E.2d 934, *modified on appeal* (1984), 105 Ill. 2d 1, 473 N.E.2d 1270; and *People v. Dockery* (1966), 72 Ill. App. 2d 345, 355, 219 N.E.2d 687 (right to counsel does not attach upon the filing of a criminal complaint and the issuance of an arrest warrant absent proof of significant prosecutorial involvement in procuring the arrest warrant).) However, we need not reach the question as to whether adversarial proceedings commence upon the filing of a criminal complaint because we believe that in this case they had commenced prior to the lineup.

It is clear that the initiation of judicial criminal proceedings is determined by looking to the point at which the government has committed itself to prosecute and the adverse positions of the parties have solidified. (*Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82.) The record here discloses that the offenses occurred on March 1, 1984, and that Cyrus Carey filed the criminal complaint on March 4, and it is indicated that Carey was assisted by someone in the preparation of the complaint as it was typewritten on a printed court form and contains the statutory designation of armed robbery. While the record does not disclose who may have assisted Carey, it does appear that the State's Attorney was involved in this matter before the lineup. Carey testified that the stocking used as a mask in the crime was shown to him by the police before the lineup when "I was talking to the State's Attorney." There being nothing in the record negating the fact that the State's Attorney was involved at that time and since the stocking bore no relation of any kind to the lineup, it follows that it was shown to Carey in the preparation of the prosecutor's case. Under these circumstances we

---

[1]In reviewing the appellate court's decision in *People v. Curtis* (1985), 132 Ill. App. 3d 241, 476 N.E.2d 1162, the supreme court again declined to reach this issue. See *People v. Curtis* (1986), 113 Ill. 2d 136, 143.

believe that adversarial proceedings had commenced at that time and, because no counsel was present at the lineup, the lineup was held in violation of the sixth amendment. We therefore conclude that the lineup identification should have been suppressed.

 We reject, however, the contention of defendant that the in-court identification by Carey also should have been suppressed because it had no basis independent of the counselless lineup identification. In *United States v. Wade* (1967), 388 U.S. 218, 239-42, 18 L. Ed. 2d 1149, 1164-66, 87 S. Ct. 1926, 1939-40, and *Gilbert v. California* (1967), 388 U.S. 263, 272, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1956, the Supreme Court held that an in-court identification may be admitted if the State establishes by clear and convincing evidence that the identification had an independent basis. To decide whether Carey's in-court identification had an origin independent of the uncounseled lineup, several factors must be considered, including "the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to the lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." (*United States v. Wade* (1967), 388 U.S. 218, 241, 18 L. Ed. 2d 1149, 1165, 87 S. Ct. 1926, 1940.) Notwithstanding the dissent's repeated assertions to the contrary (148 Ill. App. 3d at 146-47, 149), the independent-basis determination can be made by a reviewing court where the record permits an informed judgment, and the court may find a sufficient alternative foundation for the in-court identification even where a small number of these factors are present. (*People v. Curtis* (1986), 113 Ill. 2d 136, 147.) In our judgment, the record in this case allows an informed judgment, and evaluation of the *Wade* factors demonstrates convincingly that Carey's in-court identification was based on his observations during the crimes, not on seeing defendant at the uncounseled lineup.[2]

Cyrus Carey viewed defendant at the time of the robbery for approximately two minutes before defendant pulled the mask over his

---

[2]Although the dissent finds fault with the State for not introducing evidence on this question (148 Ill. App. 3d at 146-47, 149-51, 153), this criticism misses the mark. As the dissent itself recognizes (148 Ill. App. 3d at 147), once the trial court denied defendant's motion to suppress the lineup-identification testimony, there was no reason for the State to prove that the in-court identification had an independent basis. Parenthetically, we note that, contrary to the assertions in the dissent (148 Ill. App. 3d at 147, 147 n.2, 149 n.3), both the State and defendant have addressed the independent-basis issue in their briefs.

face. In addition, Carey recalled that he had seen defendant two weeks earlier in the hallway of his apartment building. Carey selected defendant's photograph two days after the crimes which was one week before he identified him in the lineup. Moreover, an examination of the record flatly contradicts the assertions made in the dissent that "there was no evidence of what description Carey gave of the robber to the police" and that no "evidence of the defendant's description [was] presented at the trial." Carey testified on cross-examination that he had described the two offenders to the police and, on further cross-examination, he specifically mentioned defendant's age and relative height. Although defense counsel did not explore the details of Carey's physical description of defendant, it is reasonable to assume that had there been any material discrepancies between that description and defendant's actual appearance, they would have been brought out at trial to impeach Carey's credibility and his in-court identification. There was no evidence in the record that Carey had identified anyone other than defendant as the shorter of the two offenders or that he had failed to identify defendant on any prior occasion. Again, it is reasonable to assume that any misidentification or nonidentification would have been brought to the attention of the trier of fact.

Upon our review of the record we are satisfied that there was an independent basis for Cyrus Carey's in-court identification of the defendant. The trial judge not only expressed his belief that Carey had "testified honestly" but also stated that he "had sufficient opportunity to observe the individual who, in fact, stuck him up." The judge concluded that "on the basis of the evidence reviewed here, the encounter between defendant when he was unmasked and the State's principal witness, was more than sufficient to support the in-court identification of the defendant." We agree with this assessment. Moreover, we are unable to conclude that the findings of guilty could have been influenced by the erroneously admitted lineup-identification testimony. In his entire statement the trial judge mentions the lineup identification only once and then only in reference to Carey's recollection of the crime "when he goes through these photographs and later at the lineup and today at trial." Contrary to the assumption of the dissent, nowhere does it appear that the trial judge placed any particular reliance on the lineup identification and, in fact, from a reading of the record it appears clear that the lineup identification was not a factor in his decision. We agree with the trial court that Carey had an adequate opportunity to observe defendant's face during the occurrence, and in view of his positive in-court identification we find no er-

ror in the court's refusal to suppress his identification testimony. See *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *People v. Strater* (1979), 72 Ill. App. 3d 486, 390 N.E.2d 979.

### III

■ Defendant finally contends that the court erred in convicting him of both home invasion and residential burglary. Defendant argues that since both convictions were based upon a single entry, the conviction for residential burglary must be vacated under the one-act, one-crime rule of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.

In *King*, the supreme court held:

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d 551, 566, 363 N.E.2d 838.)

Thus, if one of two offenses is not a lesser included offense of the other, both convictions may stand unless each is "carved from the same physical act." Defendant does not dispute that neither residential burglary nor home invasion is a lesser included offense of the other. (See *People v. Robinson* (1984), 125 Ill. App. 3d 1077, 1079-80, 467 N.E.2d 291, and *People v. Hawkins* (1984), 125 Ill. App. 3d 520, 521-22, 466 N.E.2d 299, and the cases cited therein.) Defendant, however, argues that both convictions were based on the same physical act of entry. We disagree.

In *People v. Snow* (1984), 124 Ill. App. 3d 955, 464 N.E.2d 1262, the court held that although home invasion and residential burglary may share the physical act of entry, they are not based upon the same physical act. The court explained that while residential burglary is complete once an unlawful entry is made with the requisite intent, home invasion is not complete until, after an unlawful entry, defend-

ant either uses force or threatens use of force upon a person in the home while armed with a dangerous weapon, or intentionally causes any injury to a person in the home. The court concluded that the offenses of residential burglary and home invasion are not based on the same physical act as the common element of unlawful entry does not complete the offense of home invasion. (124 Ill. App. 3d 955, 963, 464 N.E.2d 1262.) See also *People v. Lobdell* (1983), 121 Ill. App. 3d 248, 459 N.E.2d 260.

■ In support of his argument that residential burglary and home invasion are based on the same physical act, defendant relies principally on *People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011, and *People v. Green* (1980), 83 Ill. App. 3d 982, 404 N.E.2d 930. In *Jones*, where the State confessed error, the court held that as the same physical act of entry constituted the basis for both burglary and home invasion, vacation of the burglary conviction was required. (*People v. Jones* (1982), 108 Ill. App. 3d 880, 890, 439 N.E.2d 1011.) We note, however, that in *People v. Rathgeb* (1983), 113 Ill. App. 3d 943, 447 N.E.2d 1351, the appellate court overruled its earlier decision in *People v. Jones, sub silentio,* and held that convictions for both burglary and home invasion were proper, even though there was only one physical act of entry. (113 Ill. App. 3d 943, 949, 447 N.E.2d 1351.) In *People v. Green* (1980), 83 Ill. App. 3d 982, 404 N.E.2d 930, the defendant had been convicted of armed violence based on burglary and home invasion. On appeal, the court vacated the armed-violence conviction because of a fatal variance between the evidence presented at trial and the indictment. (83 Ill. App. 3d 982, 986, 404 N.E.2d 930.) In *dicta,* the court stated that even if it considered the variance in the indictment to be nonfatal, defendant's convictions for armed violence based on burglary and home invasion could not both stand because the convictions were based on the identical act of entry. (83 Ill. App. 3d 982, 986, 404 N.E.2d 930.) However, the same district of the appellate court that decided *Green* repudiated this analysis in *People v. Lobdell* (1983), 121 Ill. App. 3d 248, 249-51, 459 N.E.2d 260. In our judgment, defendant was properly convicted and sentenced for both residential burglary and home invasion.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that defendant be assessed $50 as costs for defending this appeal, and incorporate it in our judgment.

Affirmed.

LORENZ, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. In my judgment the trial court erred in overruling the defendant's motion to suppress and in admitting into evidence Cyrus Carey's testimony of the uncounseled lineup identification of the defendant as one of the robbers. Carey's testimony of the defendant's uncounseled lineup identification should have been suppressed as evidence against the defendant because it occurred after adversarial judicial proceedings had been initiated against the defendant and thus violated his right to counsel under the sixth amendment of the United States Constitution and article I, section 8, of the Illinois Constitution. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877; *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 155-65, 476 N.E. 2d 1179 (Pincham, J., dissenting).) The trial court's error in overruling the defendant's motion to suppress Carey's lineup-identification testimony demands reversal and remandment for a new trial. It is inappropriate for this court to affirm the defendant's judgment of conviction and thereby validate the trial court's error.

I do not agree with the majority's holding that:

(1) "[W]e are unable to conclude that the findings of guilty could have been influenced by the erroneously admitted lineup-identification testimony."

(2) "[N]owhere does it appear that the trial judge placed any particular reliance on the lineup identification," and

(3) "[F]rom a reading of the record it appears clear that the lineup identification was not a factor in his decision."

The State did not contend in the trial court that the trial court was uninfluenced by Carey's testimony of the defendant's uncounseled lineup identification in determining the defendant's guilt. This was not an issue before the trial court and the trial court did not so rule.

The defendant's pretrial motion to suppress Carey's lineup-identification testimony asserted that the defendant was not informed of his right to counsel at the lineup and that his attorney was not present at the lineup proceedings in which he was identified as the robber. The motion prayed that the court suppress:

"a. Any reference to the pre-trial identification of the accused by such witnesses as were involved in the improper pretrial identification.

b. The in-court identification of the accused by Cyrus Carey in the improper pre-trial identification inasmuch as such identification is the product of the improper pre-trial identification,

unless the State shows by clear and convincing evidence that the in-court identification is not tainted and is fully independent of pre-trial identification."

The trial court heard defendant's motion simultaneously with the trial and denied the motion at the close of the State's case. Because the trial court denied the defendant's suppression motion and because the State did not assert it, the trial court did not decide (1) whether Carey's in-court identification of the defendant was influenced by his improper pretrial lineup identification of the defendant; or (2) whether the State established by clear and convincing evidence that Carey's in-court identification of the defendant was tainted by or was independent of his illegal pretrial lineup identification. Although the trial court did not decide either question, the majority nevertheless, *sua sponte*, holds that the trial court in reaching its guilty finding was not influenced by Carey's testimony of his lineup identification of the defendant as the robber.[1]

I disagree with the majority's holding first, because it constitutes tacit judicial approval of the violation and circumvention of the revered constitutional right to counsel, second because the parties have not relied on, briefed or argued this contention before this court, third, because the trial court did not rule on this issue, and fourth, contrary to the majority's assertion, the trial court's remarks clearly reveal that it was influenced by Carey's lineup-identification testimony in its determination that the defendant was guilty.[2]

In his argument in the trial court in support of the defendant's motion to suppress Carey's lineup-identification testimony, defense counsel urged:

> "But I believe that he [Cyrus Carey] identified a photograph some days later at the Evanston Police Department. I believe he then picked Mr. Jones out of a line-up, again based on a matter of seconds that he had to observe the two gunmen *** ."

In his argument to the trial court in opposition to the defendant's suppression motion, the assistant State's Attorney stated:

> "You have an identification out of a police book two days later. You have a subsequent identification [of the defendant by Cyrus Carey at the lineup] eight days after the incident."

---

[1]Cyrus Carey's lineup-identification testimony is set forth in Appendix A.

[2]Contrary to the majority's contention, neither party has relied on, briefed or argued in this court the influence of Carey's uncounseled lineup-identification testimony on the trial court's guilty finding.

At the conclusion of the evidence and arguments the trial court stated:

> "*I've considered the evidence on the trial of this case* and listened attentively to the testimony of the various witnesses \*\*\*." (Emphasis added.)

The direct and cross-examination testimony of Cyrus Carey's lineup identification of the defendant was "evidence on the trial" which the trial court "considered" and to which it "listened attentively."

The trial court concluded that it believed that Cyrus Carey testified honestly. The trial court did not exclude Carey's lineup-identification testimony from that assessment, nor did it confine that assessment to Carey's in-court identification testimony.

The trial court further concluded:

> "And in my estimation it would appear that he had a sufficient opportunity to observe the individual who in fact stuck him up.
>
> *It's a matter then of whether or not he has an accurate recollection of that matter when he goes through those photographs and later at the line-up and today in court.* \*\*\* I believe some individuals have a greater talent for this than others.
>
> And I would say that *on the basis of the evidence received here,* the encounter between the defendant when he was unmasked and the State's principal witness, was more than sufficient to support the in-court identification of the defendant." (Emphasis added.)

From the trial court's foregoing remarks, it is clear to me that the court relied on Carey's lineup-identification testimony. Moreover, the trial court stated that it predicated its guilty finding *"on the basis of the evidence received here."* The "evidence received here" included Cyrus Carey's lineup-identification testimony. It is quite apparent that this testimony was a factor in the trial court's decision that the defendant was guilty of the robbery.

While it is true, as the majority points out, the trial court mentioned Carey's testimony of the lineup identification only once, in so doing the trial court manifested a reliance on this testimony in its finding of guilty. The trial court also only once mentioned the in-court identification testimony even though it was by far less extensive than the lineup-identification testimony.

The majority's conclusion "that Carey's in-court identification was based on his observation during the crimes, not on seeing defendant at the uncounseled lineup" avoids the issue. The defendant's conten-

tion is that in determining it was the defendant who committed the offense and in finding the defendant guilty, the trial court relied improperly on the constitutionally inadmissible testimony about Carey's identification of him as the robber at the uncounseled lineup. The majority's conclusion that "we are unable to conclude that the findings of guilty could have been influenced by the erroneously admitted lineup-identification testimony" is diametrically opposed to the trial court's statements, and, equally important, this contention was not argued or briefed by the parties in this court.

It was the defendant's contention in the trial court and it is the defendant's contention before this court, as set forth in point II in his brief, that "[t]he counselless post-complaint lineup identification of James Jones violated the Sixth Amendment, and the motion to suppress identification should have been granted." The State did not contend in the trial court that Carey's in-court identification of the defendant was uninfluenced by his lineup identification or that Carey's in-court identification had an independent basis.[3] The State had an adequate opportunity in the trial court to accept the defendant's invited challenge to establish by clear and convincing evidence that Carey's in-court identification had an independent basis, but the State chose not to do so. This court's initial finding that Carey's identification had an independent basis effectively denies the defendant his right to present evidence to refute it.

In *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 23 1149, 87 S. Ct. 1926, the defendant was identified as the bank robber by two witnesses in a post-indictment lineup conducted in the absence of the defendant's court-appointed counsel. One of the questions presented on review was whether the denial of Wade's motion to strike the witnesses' courtroom identification of the defendant required a new trial at which such evidence would be excluded. The court held:

> "We do not think that this disposition can be justified without first giving the Government the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification.
>
> * * *
>
> We think it follows that the proper test to be applied in

---

[3]The majority is mistaken when it states that the dissent asserts that the parties in this court have not briefed the independent-basis issue. The arguments in the State's and defendant's briefs on the independent-basis issue constitute a total of only five sentences.

these situations is \*\*\* ' "[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." ' [Citation.]" 388 U.S. 218, 240-41, 18 L. Ed. 2d 1149, 1164-65, 87 S. Ct. 1926, 1939.

The court concluded:

> "*On the record now before us we cannot make the determination whether the in-court identification had an independent origin. This was not an issue at trial,* although there is some evidence relevant to a determination. That inquiry is most properly made in the District Court. We therefore think the appropriate procedure to be followed is to vacate the conviction pending a hearing to determine whether the in-court identification had an independent source, or whether, in any event, the introduction of the evidence was harmless error, Chapman v. California [(1967)], 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, [828], and for the District Court to reinstate the conviction or order a new trial, as may be proper." (Emphasis added.) 388 U.S. 218, 242, 18 L. Ed. 2d 1149, 1166, 87 S. Ct. 1926, 1940.

*Wade* was a case of first impression and on remand the court afforded the government an opportunity to follow its mandate. In the case at bar, the State could have followed the *Wade* mandate in the trial court and sought to establish by clear and convincing evidence that Carey's in-court identification had an independent source, but the State did not do so. The State should not be permitted to successfully assert before this court for the first time that it did and thereby preclude the defendant from presenting contrary evidence on the independent-basis issue.

In *Gilbert v. California* (1967), 388 U.S. 263, 272, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1956 (decided June 12, 1967, the same day as *Wade*), also a case of first impression, post-indictment, uncounseled lineup-identification testimony was admitted against the defendant in the guilt and penalty phases of his trial. The court held that the admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error. The court further held:

> "However, as in Wade, the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had a independent source. Gilbert is therefore entitled only to a vacation of his conviction pending the holding of such proceedings as the California Supreme Court may deem ap-

propriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that their introduction in evidence was in any event harmless error.

* * *

*** *[U]nless the California Supreme Court is 'able to declare a belief that it is harmless beyond a reasonable doubt,' Chapman v. California [(1967)], 386 U.S. 18, 24, 17 L. Ed. 2d 705, 711, 87 S. Ct. 824, [828], Gilbert will be entitled on remand to a new trial ***.*" (Emphasis added.) 388 U.S. 263, 272, 274, 18 L. Ed. 2d 1178, 1186, 1187, 87 S. Ct. 1951, 1956, 1957.

Although bound by and having the benefit of *Wade* and *Gilbert*, the State in the case at bar made no effort to establish that Carey's in-court identification of the defendant had an independent source, even though the defendant's suppression motion challenged the State to do so. Having overruled the defendant's motion to suppress the lineup-identification testimony and the State having refused to attempt to establish that Carey's in-court identification was not tainted by the lineup identification or had an independent origin, the trial court did not make such a determination. *United States v. Wade* (1967), 388 U.S. 218, 240, 18 L. Ed. 2d 1149, 1164-65, 87 S. Ct. 1926, 1939; *Gilbert v. California* (1967), 388 U.S. 263, 272-73, 18 L. Ed. 1178, 1186, 87 S. Ct. 1951, 1956-57.

Our supreme court recently held in *People v. Curtis* (1986), 113 Ill. 2d 136, that the *Wade-Gilbert* independent basis determination can be made by a reviewing court where the record permits an informed judgment. The record in the case at bar does not allow an informed judgment to be made as to whether the in-court identification had an independent basis. The court in *Curtis* pointed out that the *Wade-Gilbert* factors to be considered in determining whether an in-court identification has an origin independent of and untainted by the uncounseled lineup include (1) a prior opportunity to observe the criminal act; (2) the existence of any discrepancy between any prelineup description and the defendant's actual description; (3) any identification prior to the lineup of another person; (4) the identification by picture of the defendant prior to the lineup; (5) failure to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the lineup identification. (113 Ill. 2d 136, 147.) These are only some of the factors. I do not believe that they exclude other factors such as the witness' difficult task of avoiding the influence of his lineup-identification experience from his in-court identification.

The court further pointed out in *Curtis* that the reviewing court may find a sufficient alternative foundation for the in-court identifica-

tion even where a small number of the *Wade-Gilbert* factors are present. Again, in the case at bar, there was no evidence on which there could be a sufficient alternative foundation for the in-court identification.

In *Curtis* the court found that the first *Wade-Gilbert* factor existed—the opportunity to observe the incident. The court pointed out that the robbers were in the store between 15 and 30 minutes from the time they entered the store until they shut the robbery victims in a storage room. Before the robbery the witness Buckle had an opportunity to view both robbers when he saw them looking at merchandise and when he asked one of them if he could help him. Buckle saw one of the robbers pull his gun and saw him again when the robber walked to the front of the store. Buckle also saw the other robber as he followed Buckle to various places in the store where money was kept and when he held Buckle and the other employees at bay with his gun.

In the case at bar, Carey's opportunity to observe the incident was not nearly as adequate. When he opened the door he was startlingly confronted by two armed men pointing guns at him. He was unsuccessful in attempting to close the door. One of the robbers, who he identified as the defendant, immediately pulled a stocking mask over his face. Carey estimated that he observed the robbers for two minutes, which appears to be a liberal estimate considering his brief encounter at the door before the offender pulled the mask over his face. Thereafter, Carey was unable to observe the offender.

The second *Wade-Gilbert* factor which the court found to be present in *Curtis* is totally absent from the case at bar, *i.e.*, that the description of the two robbers which Buckle gave to the police closely matched the defendants' descriptions. The court in *Curtis* then set out the descriptions of the robbers which Buckle gave the police and the descriptions of the two robbery defendants. In the case before us there was no evidence of *what description* Carey gave of the robber to the police. Nor was there evidence of the defendant's description presented at the trial.[4] It necessarily follows that the third *Wade-Gil-*

---

[4]Although the majority contends that "an examination of the record flatly contradicts [these] assertions made in the dissent," the majority does not designate that portion of the record which contradicts these assertions. Carey's cross-examination testimony to which the majority refers was simply, "I tried to describe them [the offenders]" to the police. *What description* Carey gave or attempted to give the police is not revealed in the record. The "relative height" cross-examination testimony of Carey relied on by the majority was, "The man with the handgun was the shorter one of the two." This cross-examination testimony of Carey is set forth in full in Appendix B.

*bert* factor, the existence of any discrepancy between any prelineup description of the offender and the defendant's actual description is not present in the case at bar.

It certainly was not the responsibility of defense counsel to "explore the details of Carey's physical description" of the offenders or to establish that Carey "had failed to identify defendant on any prior occasion" in order to refute that there was an independent basis, as the majority suggests. This burden was on the State if it chose to rely on an independent basis for the in-court identification. Moreover, the majority's assumptions that "had there been any material discrepancies between [Carey's physical description of defendant] and defendant's actual description, they would have been brought out at trial," and that "any misidentification or nonidentification would have been brought to the attention of the trier of fact," are inadequate substitutes for evidence. The *Wade-Gilbert* factors alluded to in *Curtis*, from my reading of the three cases, are to be established by evidence and not by assumptions. These factors cannot be established by the absence of evidence. Nor are these *Wade-Gilbert* factors to be predicated on assumptions from the absence of evidence.

Carey's testimony that he had once previously seen the defendant in the building was impeached. The defendant's photograph was not offered or received in evidence and no determination therefore can be made as to what influence the picture might have had on Carey's in-court identification. There were 10 days between the robbery and the lineup identification and there were almost 10 months between the robbery and the in-court identification.

The record in the case at bar is silent on the other *Wade-Gilbert* factor on which the court relied in *Curtis* in deciding that the evidence clearly and convincingly established an independent basis for the in-court identification, *i.e.*, whether Carey identified anyone else's picture other than the defendant's.

The court concluded in *Curtis* that there were an adequate number of the *Wade-Gilbert* factors present, independent of the uncounseled lineup identification which clearly and convincingly established an independent basis for the in-court identification and that the in-court identifications therefore were not tainted by the uncounseled lineup identification. No such independent basis determination can be made in the case at bar because the record in the case at bar, unlike the record in *Curtis*, does not permit an informed judgment.

Moreover, the court concluded in *Curtis* that the evidence and the testimony of Kinnie, a store security guard who was present and who was an accomplice in the robbery, was so overwhelming against the

defendants that the admission of the testimony of the uncounseled lineup identification was harmless error beyond a reasonable doubt. The court also held that it was clear beyond a reasonable doubt that the defendant would have been convicted even absent the admission of Buckle's lineup-identification testimony.

The majority in the case at bar, however, by simply stating that "we are unable to conclude that the findings of guilty could have been influenced by the erroneously admitted lineup-identification testimony," has determined that the admission of Carey's testimony of the uncounseled lineup identification was harmless error beyond a reasonable doubt and that beyond a reasonable doubt the defendant would have been convicted absent the admission of such testimony. This is not the proper standard. The appropriate criteria according to *Curtis* was whether the admission of Carey's testimony of the uncounseled lineup identification of the defendant as the robber was harmless error beyond a reasonable doubt. I submit it was not.

For the reasons stated, I believe the trial court erred in admitting and relying on Carey's testimony of his identification of the defendant in the uncounseled lineup and I would reverse the conviction and judgment and remand the cause for a new trial.

APPENDIX A

Cyrus Carey's lineup-identification testimony of the defendant as the robber.

*Direct-examination:*

"Q. [S]pecifically on March 10, 1984, did you have occasion to go to a Chicago police station over at Belmont and Western?

A. Yes.

\* \* \*

Q. Okay, at that time did you have occasion to view a line-up?

A. Yes.

Q. Okay, would you tell the court exactly how that line-up was conducted?

A. Well, it was about five or six guys standing in a straight line. And the officer asked me, the officer asked me to stand in front of a glass, a big glass window looking. And I stand there and they would come up in order in front of the glass so that I could get a clear view.

Q. Did you identify anybody in that group of five of six men as the person who robbed you on March 1, 1984?

A. Yes. I identified this same man sitting right there.

Q. Did anybody, police officer or anybody at all tell you who to identify?

A. No.

Q. Did anybody indicate in any manner, shape or form how you should identify anybody?

A. No.

MR. BENSON: I'm going to ask leave of Court to mark this People's Exhibit Number Two and Three for Identification, People's Two being a side view of a five-man line-up, and People's Three being a front view of a five-man line-up.

Q. For the record I'm going to ask you, Mr. Carey, to take a look at what I'm putting in front of you, which is People's Exhibit Number Three for Identification. Do you recognize what that is, sir?

A. This look, these look like some of the people who was in the line-up with James, with James.

Q. Do you see the individual in that photograph who you identified as the person who robbed you?

A. Yes.

Q. Would you put an 'X' over his head, please?

* * *

Q. Okay, now I'll call your attention to the headgear on two of these individuals. Was that headgear on two of these individuals. Was that headgear on those individuals at the time you saw the line-up in a different room?

* * *

A. Well, I'm not sure about the hats, you know.

Q. I call your attention to the man who you put an 'X' over.

A. Yes.

Q. He appears to have a cigarette in his hand, is that correct?

A. Well, I'm not sure if he was smoking cigarette at the time.

Q. Of the line-up.

A. Of the line-up. I'm not sure he was smoking cigarette.

Q. I'm going to show you People's Exhibit Number Two for Identification. Do you recognize what that is?

A. Yes.

Q. Is that a side view of the same line-up?

A. Yes."

*Cross-examination:*

"Q. Mr. Carey, you just told Judge Close about going down to the police station and viewing a line-up, is that right?

A. Yes.

Q. You had a chance to look at that group of men you say was five or six men in that line-up, is that right?

A. Yes.

Q. ***. About how long did you look at those men in that line-up?

A. Approximately two, three minutes. It wasn't too long.

Q. But for three minutes you, three minutes you looked at these men?

A. Yes.

Q. Before you were told to view these men?

A. Right.

Q. Did the Chicago Police show you a photograph, a picture?

A. No, not except for the one that I picked at the --

Q. Which you had done at the Evanston Police Department?

Q. Yes.

Q. On March 3rd?

A. Yes.

\* \* \*

Q. Sir, when you were looking at that line-up were you looking through one-way glass?

A. Yes, I think so.

Q. So the people that were inside the room could not see you?

A. Right, right.

Q. When you were looking at the line-up, were you at all scared?

A. No, not really.

Q. Were you nervous?

A. No.

Q. You took your time and you looked, is that right?

A. Right.

\* \* \*

Q. When did you first see the stocking that you have identified here in court?

\* \* \*

A. The police, when they take me for the line-up, and I was talking to the State's Attorney.

Q. On the 10th of March?

A. Yes.

\* \* \*

Q. Remind me how long you stood and looked at that line-up when you weren't scared and you didn't have guns staring at you?

A. Approximately three minutes.

Q. How many men were standing in the line-up?

A. I would say five or six."

## Appendix B

Cyrus Carey's testimony of his conversation with the police to whom he reported the robbery.

*Cross-examination:*

"Q. Did you talk to the police soon after these two men with the guns left?

A. Approximately twenty minutes after they left, something like that.

Q. So 1:30 on March 1st you talked to the police. You described the two guys, did you not?

A. Yes, I described. *I tried to describe them.*

Q. You tried your best. You described the guy with the shotgun and the guy with the handgun, is that right?

A. Yes.

Q. *And you described the guy with the handgun as being in his late 20s,* is that correct?

A. *No more than that.*

Q. What did you tell the police? You tell me.

A. *Maybe about 29.*

Q. Not late 20s? 29. Did you describe how tall the man with the handgun was?

A. *The man with the handgun was the shorter one of the two.*

Q. The shorter one of the two?

A. Yes.

Q. Did the police ask you what the men were wearing?

A. Yes, they asked me.

Q. Did you tell them?

A. Yes.

Q. You told them that the one with the handgun had bluejeans on, is that correct?

A. Bluejeans.

Q. Do you remember telling the police that?

A. *I don't quite remember what I tell the police.* What I do remember I tell the police they were wearing hard shoes, hard boots.

Q. Did you tell the police that they had on a black stocking mask like the one you have identified in court here?

A. *I'm not sure if it was, if I tell the police black.*

Q. Did you tell them he was wearing a stocking mask?

A. Yes, a mask.

Q. Did you tell them he was wearing a blue hat, the man with the gun?

Q. Yes, they were wearing blue hat.

A. When you say they, they both were, both?

A. No.

Q. Who was wearing a blue hat?

A. I think this one.

Q. But you're not sure?

A. *I'm not sure which one of them was wearing a hat.*" (Emphasis added.)